HART et al. v. GLOBE INS. CO. et al

(Circuit Court, N. D. Illinois. February 14, 1882.)[1]

1. JUDGMENTS—PERSONS CONCLUDED—CREDITORS' SUITS.

Judgment creditors of an insolvent insurance company filed a creditors' bill in the federal court against the company and one H., a former officer and director of the company, to set aside a transfer of securities from the company to H. as constituting an illegal preference, and in such suit a receiver was appointed for the company, to whom it conveyed its property. Two days prior to the commencement of such suit a similar suit was instituted in a state court by a simple contract creditor against substantially the same defendants, over whom the state court obtained priority of jurisdiction. Subsequent to the appointment of the receiver by the federal court, H. filed a cross bill in the state court, upon which, on final hearing, the court adjudged the validity of the transaction by which the company transferred the securities to him, determined the amount due him from the company, and ordered a sale of the securities to pay the same. Prior to such decree the company had been adjudged a bankrupt, the receiver had been elected assignee, and had joined as a co-complainant in the suit in the federal court, and H. had also filed a similar cross bill therein. Held, that the decree of the state court was not a bar to the further prosecution of the suit in the federal court; neither the original complainants therein, nor the assignee, nor any representative of the general creditors of the company having been made parties to the cross bill upon which such decree was based.

2. CORPORATIONS—INSOLVENCY—ILLEGAL PREFERENCE OF OFFICER.

Defendant purchased from two of the officers and directors of an insurance company stock of the company to the amount of $75,000, and by an arrangement made at the same time the sellers advanced the amount received for the stock and defendant a substantially equal amount as a loan to the company to make good its impaired capital, and place it in a condition to continue its business. The advances were accepted under an agreement embodied in a resolution of the board of directors providing that the advances, which consisted of cash and securities, should be held as assets of the company, and subject to its debts, but should be returned or repaid, with interest, when the company should be in a position to justify it. Defendant became president and a director of the company. A year later, when the company was in fact insolvent, defendant resold his stock to the persons from whom he bought it, receiving in payment an assignment of the identical cash and securities which he had paid therefor, and which had been advanced to the company. Subsequently, and while defendant was still president and a director, negotiations were entered into between him and the company, which resulted, either prior to or just after his retirement, in a settlement of his entire claim against the company on account of the advances so made and others, and the transfer to him by the company of securities amounting to about $200,000, either absolutely or as collateral to the company's note, through which he afterwards obtained title thereto. Held, that the advances having been expressly made and accepted as assets of the company, subject primarily to its outside indebtedness, the attempted repayment of such advances in the insolvent condition of the company and under the circumstances shown was void as against other creditors, and that defendant was accountable to such creditors for the value of the securities so transferred to him.

3. SAME—RESCISSION OF CONTRACT FOR FRAUD—LACHES.

The transaction by which defendant became a purchaser of the stock, and agreed to make advances to the company, having been expressly

---

[1] This case has not been heretofore reported, and is now published in this series, so as to include therein all circuit and district court cases which have been inadvertently omitted from the Federal Reporter or the Federal Cases.

entered into by the sellers as individuals, and not on behalf of the company, which was not the owner of the stock sold, any fraud or misrepresentation on their part was not available by defendant to entitle him to rescind the contract as against the company, even if he had seasonably asserted his claim to such right; and for still stronger reason he could not assert it, after the company's insolvency, to the prejudice of its creditors, and after he had actively participated in the conduct of its affairs as president for a year.

In Equity. Creditors' suit against the Globe Insurance Company and George F. Harding.

Frederick Ullman and D. J. Schuyler, for complainants.
Lyman Trumbull and Geo. F. Harding, for defendant Harding.

### The Parties.

DYER, District Judge. This is a creditors' bill, filed originally by Cynthia C. Hart and John S. Hart against the Globe Insurance Company, George F. Harding, the Firemen's Insurance Company, and V. A. Turpin. The bill was filed May 5, 1876, and on or about the 13th day of May of that year the Erie & Western Transportation Company intervened, and by order of court became a party complainant to the bill. On the 9th day of May, 1876, Robert E. Jenkins was appointed receiver of the insurance company, and on that day filed his bond, and on the 12th day of May the company executed to him a conveyance of all its property and property rights and interests. Subsequently the insurance company was adjudicated a bankrupt, and Jenkins was elected assignee, and on the 15th day of July, 1878, as such assignee, he was made a cocomplainant in this suit with the Harts and with the transportation company. On the 5th day of January, 1877, by stipulation of the parties on file, the bill was dismissed as to the Firemen's Insurance Company. It was stated on the argument, and not denied, that the bill had been also dismissed as to Turpin, and it is understood that the insurance company and Harding are now the sole defendants.

### The Pleadings.

The bill alleges the recovery of a judgment by Cynthia C. Hart against the Globe Insurance Company on the 4th day of May, 1876, for the sum of $1,028.15, and also the joint recovery of a further judgment by Cynthia C. and John S. Hart against the insurance company for the sum of $1,026.65; and that on the day last named executions were issued upon these judgments, which were, on the 5th day of May, 1876, returned nulla bona. The bill then charges as to the defendant Harding, on information and belief, that he has in his hands or under his control assets and securities of some nature or description belonging to the insurance company, or in which the company has some legal or equitable interest, which ought to be applied to the complainants' demands, and discovery is claimed and asked. The prayer of the bill, among other things, is that a receiver of the company may be appointed, and that Harding be decreed to account for the property of the company in his hands,

and turn the same over to the receiver for satisfaction of complainants' judgments. On the 9th day of May, 1876, the defendant Harding answered the bill, and on the 15th day of February, 1877, filed an amended and supplemental answer. On the same 9th day of May, the Globe Insurance Company and the Firemen's Insurance Company also separately answered, but the issues to be here determined arise wholly upon the answers of the defendant Harding to the complainants' bill. Some time after this suit was begun, the defendant Harding filed a cross bill in the nature of a bill of interpleader against the insurance company, Robert E. Jenkins, one A. F. Fawsett, and the complainants herein, alleging that he (Harding) had in his hands and claimed to own as his own property some notes, amounting to over $40,000, signed by the South Chicago Land & Building Association, and secured by a trust deed or mortgage on property in this county; that said notes and mortgage were claimed by said Jenkins and by said Fawsett; that Fawsett had commenced a suit in trover for the value thereof against Harding; and he prayed that they might be decreed to interplead concerning the same It appears, however, that Jenkins has filed a disclaimer of all interest in said notes, and, as between Fawsett and Harding, the matter has been settled in Harding's favor (at least so far as this suit is concerned) by a trial of the trover suit, so that this cross bill is now out of the case.

## Statement of Facts of Case.

There is, perhaps greater difficulty in determining what are the precise facts of this case in some of its branches than in determining correctly the principles of law applicable to the facts. The contention of the parties is of more than usual magnitude, and the court has therefore not been unmindful of the necessity of thoroughly searching the case in all its complicated details, to the end that correct conclusions might be reached upon the material issues involved. The testimony is very voluminous, but portions of it are found to be quite irrelevant, since certain of the issues originally involved have ceased to be the subject-matter of contest. Upon the argument the accuracy of the printed abstract of the testimony furnished to the court was much questioned by counsel on both sides, and the court has therefore felt it to be its duty to carefully read and examine the entire mass of original testimony as it came from the hands of the master, and as the result of such examination the material and important facts of the case are found to be as follows:

In July, 1874, and for several years prior thereto, the Globe Insurance Company was and had been engaged in the business of fire insurance in the city of Chicago. George K. Clark was then the president and Sidney P. Walker was the secretary of the corporation. On account of very heavy losses sustained by what is known as the fire of July 14, 1874, the capital of the company became impaired. This impairment was undoubtedly more serious than some of the parties to the transactions about to be narrated then supposed. In order to restore the company to a sound condition,

Clark and Walker set on foot measures to obtain additional capital, and to that end opened negotiations with Harding, McCoy & Pratt, a law firm in Chicago, with a view to enlisting them in the enterprise. A trial balance of the company was exhibited to those parties, or some of them, for the purpose of enabling them to determine whether the purchase of stock would be a good investment. There is some conflict in the evidence upon the question of the extent to which the defendant George F. Harding examined this trial balance and investigated the affairs of the company at this time. To some extent, undoubtedly, he examined the statements exhibited to him, though the circumstances of the transaction tend quite strongly to show that the principal examination, so far as any was made, was left to Mr. Pratt. I do not, however, deem this very material. Whatever the facts may be in that regard, the negotiations between the parties resulted in a contract between Harding, McCoy & Pratt of the one part and Clark and Walker of the other, dated July 28, 1874, by which the parties formed a copartnership so far as related to their contemplated interests in the company, and which in its material parts was as follows:

First. Clark and Walker agreed to sell to Harding, McCoy & Pratt $75,000 of the stock of the company at par, and the purchasers agreed to pay therefor as follows: $25,000 in cash, $25,000 in real estate mortgages, and $25,000 in other securities.

Second. It was agreed that Harding, McCoy & Pratt should have the right to buy, and Clark and Walker were to aid them in purchasing, stock on the best possible terms until the interests of the respective first and second parties in the stock of the company should become equal in amount, it being declared in the contract that Clark and Walker then held, after selling $75,000 of the stock, $110,000 of the stock of the company.

Third. It was further agreed that in case Clark and Walker should retain their own stock and give to Harding, McCoy & Pratt the stock of other parties, Harding, McCoy & Pratt should have the right at any time within one year to demand from Clark and Walker an equal amount of their own stock at par, on like terms, but not to exceed the sum necessary to equalize the several amounts of stock of the several parties to the contract, and that after such equalization of stock all purchases made by either party should be shared by them fairly, dividing the stock and paying therefor according to the terms of said purchase.

Fourth. It was agreed that within 30 days, and before Harding, McCoy & Pratt should be obliged to pay more than the cash payment of $25,000 upon the stock then purchased, they might name and have elected three persons as directors of the company, and should have the right to name the vice president, and also the chairman of the executive and finance committee, which should consist of the president and vice president of the company and such chairman.

Fifth. It was further agreed that the several parties to this contract should unite in the election of the next and each succeeding board of directors of the company, each party naming one-half of

the same, and that, if any odd number should be the number of the board, then the additional director for the odd place should be selected by mutual agreement or the place remain vacant.

Sixth. It was declared that the object of the contract was to make the insurance company a first-class company, and that all the assets, powers, and influence of the company and its several stockholders, as far as represented by the parties thereto, should be pledged and used to that end.

Seventh. That nothing contained in the contract should have the effect of making the several parties liable for each other as in the case of a common copartnership, nor beyond the scope of the contract; the intention being that the several interests should be regarded as one for the purpose of management only.

There are several features of this contract which should be particularly noticed; and first it is to be observed that Clark and Walker, in making the contract on their part and in selling the stock, acted in their individual capacities. Harding, McCoy & Pratt dealt with them as individuals, and not in any representative capacity, so far as the purchase of stock in the execution of the contract was concerned. Then it is evident that the parties contemplated that Clark and Walker might retain their own stock, and give to Harding, McCoy & Pratt the stock of other parties, and, in that event, Harding, McCoy & Pratt should have certain rights with reference to demanding from Clark and Walker at a future time an equal amount of their own stock at par, on like terms. Further, it was clearly contemplated that a large control over the affairs and management of the company should be exercised by Harding, McCoy & Pratt. This is evident from the provisions in the contract relating to the future election of directors and officers of the company and of the executive and finance committee, and, as will be seen hereafter, the subsequent action of the parties carried these provisions into effect. Lastly, it is observable that, so far as related to the interests of the parties in the company, and for purposes of management of the corporation, the contract created a copartnership, and it was the object of the agreement to put the company upon a sound basis, and the assets of the company, so far as they were represented by the parties to the contract, were pledged to that end and purpose. The stock thus contracted to be sold to Harding, McCoy & Pratt it is understood had belonged to Fawsett, Axtell, and Bowen, three stockholders in the company, who had put it in the hands of Clark and Walker to be used by them as the interests of the company might require; and it should have been previously stated that at a meeting of the directors of the company held July 21, 1874, the president was authorized to take such steps as he might deem advisable to restore the impairment of stock, and to place the company in a position to meet its obligations and maintain its credit. Under the contract before mentioned there was transferred to Harding, McCoy & Pratt stock to the amount of $75,000, which was paid for as follows: $25,000 in cash, $30,000 in real estate security furnished by McCoy or McCoy and Pratt, and $20,000 in railroad securities furnished by Harding. The last-named

securities consisted of $10,000 of first mortgage bonds of the Chicago, Burlington & Quincy Railroad Company and $10,000 of first mortgage bonds of the Burlington & Missouri River Railroad Company. The stock thus paid for was delivered to the purchasers in the following proportions: To Harding $30,000, to McCoy $22,500, and to Pratt $22,500. This was followed by a meeting of the directors of the company held August 1, 1874, at which Harding and Pratt were elected directors and members of the executive and finance committee to fill vacancies occasioned by resignations tendered at said meeting. On the 25th day of August, at a meeting of the directors held on that day, the resignation of Clark as president of the company was received and accepted, and Mr. Harding was elected president. At the same meeting Mr. Clark, on motion of Mr. Pratt, was chosen chairman of the executive and finance committee. The next step in the proceedings was to remedy the impairment of the credit of the company occasioned by previous losses, and on the 11th day of September, 1874, at a meeting of the reorganized board, Mr. Harding presiding, the following resolutions offered by Mr. Pratt were adopted:

"(1) Resolved, that this company requires additional assets in order to overcome impairment, and to properly conduct its business. (2) Resolved, that this company will, out of its surplus earnings, pay to any person or persons who will furnish such assets a dividend of not less than 10 per cent. per annum thereon, and also a dividend of a sum equal to the amount of interest collected on the securities or assets aforesaid. (3) Resolved, that such assets shall be held by this company subject to the payment of all indebtedness of this company to policy holders, and that the honor and good faith of this company shall be pledged to keep said assets intact, and return the same, with the amount of the interest collected thereon, less the amount of the dividend paid for said interest to the several persons who shall advance the same, exhausting first all other assets, as well as the individual liability of the stockholders, before said assets shall be touched or impaired. (4) Resolved, that the amount wanted, the time when wanted, and the period for which the assets are wanted, and the return or surrender of the same, or other details of the arrangements for said assets, shall be determined by the executive committee. (5) Resolved, that the stockholders of this company, in proportion to the amount of stock held by them, respectively, shall, in the first instance, be entitled, and are hereby earnestly requested, to advance said assets; and the executive committee are instructed to give them a preference, fixing a date within which they shall severally exercise said privilege. (6) Resolved, that the secretary advise the several stockholders of the above resolution at once, in order that they may accept, if they desire, the offer in number five above."

Under the terms of these resolutions, Harding, McCoy & Pratt advanced to the company: In cash, $46,918.75; $5,000 Great Western Telegraph bonds, market value, $4,500; $14,000 stock of Second National Bank of Peoria, value, $21,000; $5,000 stock of Union National Bank of Chicago, $7,500,—making a total of $79,918.75 thus contributed by Harding, McCoy & Pratt. Clark and Walker also paid in under the resolutions the following sums: Cash, $15,000; bonds of Chicago, Burlington & Quincy Railroad Company, $10,000; bonds of Burlington & Missouri Railroad Company, $10,000; real estate security, $30,000,—making a total of $65,000 contributed by Clark and Walker; and of the money and securities thus advanced by them, it should be said that they were the same

money and securities paid and delivered to them by Harding, McCoy & Pratt in payment for the stock which the latter purchased under the contract of July 28, 1874. There seems to be some question whether these advances made by Harding, McCoy & Pratt and Clark and Walker, and aggregating in all $144,918.75, were paid into the treasury of the company just prior to, or at the time of, or subsequent to the passage of the resolutions of September 11th. At all events, they were advances made for the benefit of the company under the resolutions, and the circumstances indicate that at the time the contract of July 28, 1874, was made, it was anticipated that advances would be made by the parties to that contract to remedy the impairment of the stock of the company, and to enable it to successfully conduct its business. These contributions thus made by Harding, McCoy & Pratt and Clark and Walker, are, I think, correctly defined by complainants' counsel in their brief. Although they were to belong to the company as part of its capital, and were to be held subject to the payment of its indebtedness to policy holders, they were still to occupy a higher plane than the ordinary contributions to capital, since provision was made for their ultimate return to the parties in interest in case they should not be required for the payment of debts. "They were midway between the debts of the company and its stock, subject to the debts, but preferred before the stock." And therefore these advances came to be known and spoken of in the company as the "preferred debt," and they may be thus hereafter referred to in this opinion, to distinguish them from other advances subsequently made by the defendant Harding.

Following these advancements of money and securities, there was held on the 30th of September, 1874, a meeting of the executive and finance committee, Messrs. Clark, Harding, and Pratt participating therein, at which the following resolutions were adopted:

"Resolved, that the amount required to make up the impairment and place the company in a strong financial condition is about the sum of $150,000. Resolved, further, that this committee accept of Geo. K. Clark and S. P. Walker the following securities, to wit [abbreviating the statement of the securities]:

| | |
|---|---:|
| Cash | $15,000 00 |
| C., B. & Q. 1st Mort. bonds | 10,000 00 |
| B. & M. 1st Mort. bonds | 10,000 00 |
| McCoy and Pratt's mortgage | 30,000 00 |
| | $65,000 00 |

"And further accept of George F. Harding, A. McCoy, and L. G. Pratt the following, to wit [abbreviating as before]:

| | |
|---|---:|
| Cash | $ 46,918 76 |
| Gt. Western Telegraph bonds, $5,000 par value, worth | 4,500 00 |
| Peoria Bank stock, par $11,000, worth | 21,000 00 |
| Union Nat'l Bank stock, par $5,000, worth | 7,500 00 |
| | $ 79,918 76 |
| | 65,000 00 |
| In all amounting to the sum of | $141,918 76 |

"That said securities were offered by the parties in response to the resolutions of the board of directors of the Globe Insurance Company passed September 11, 1874, and are accepted by the executive committee to be owned, held, and used under the terms of said resolution, the interest thereon to be allowed from the time the money and securities were deposited with the company."

On the same 30th day of September this action of the executive and finance committee was approved by the board of directors by resolution as follows:

"Whereas, by resolution of the board of directors of the Globe Insurance Company of September 11, 1874, it appears that the capital stock of said company was impaired, and had to be made up, and the amount, time when wanted, the period for which the assets were wanted, their surrender, etc., was left to the executive committee to determine; and whereas, the executive committee have fully considered the whole subject-matter, and have fixed the amount required at a sum not exceeding $150,000; and whereas, George K. Clark and Sidney P. Walker propose to furnish the following moneys and securities, to wit [naming the same moneys and securities as contained in the resolution of the executive committee], and George F. Harding, Alex. McCoy, and L. G. Pratt, the following [naming them as in the executive committee's resolution], in all amounting to the sum of $144,918.76, and the said securities having been examined and accepted by said executive committee: Now, resolved, that the action of said committee in the premises be approved by this board, and the said securities be accepted and held in conformity with the resolutions of September 11, 1874."

Subsequent to all of these transactions the defendant Harding became the owner of additional stock to the amount of $41,500, which had been pledged to certain Chicago banks by Clark and Walker, and at a later period Harding, McCoy & Pratt purchased still other stock to the amount of $8,000, two-fifths of which belonged to Harding; so that ultimately Harding held of the stock of the company the following amounts:

All of the $41,500 .................................................. $41,500
Of the $8,000 his share was two-fifths ............................ 3,200
Of the original stock purchased by Harding, McCoy & Pratt under
  the contract with Clark and Walker of July 28, 1874, his share was
  two-fifths .................................................... 30,000
                                                                  ――――――
Making in all ..................................................... $74,700

As before stated, Harding, McCoy & Pratt advanced to the company under the resolutions of September 11, $79,918.76. Of this amount, the several parties contributed the following shares:

McCoy and Pratt jointly, the Peoria Bank stock .............. $21,000 00
McCoy and Pratt owned three-fifths of Union stock, $7,500 ....... 4,500 00
McCoy and Pratt owned three-fifths of telegraph bonds, $4,500 .... 2,700 00
                                                                 ―――――――――
Making the amount contributed by them .................... $28,200 00

Harding advanced cash ...................................... $46,918 75
Also two-fifths of Union Bank stock ....................... 3,000 00
Also two-fifths of telegraph bonds ........................ 1,800 00
                                                            ――――――――――
Making the amount contributed by him ...................... $51,718 75

At some time after the adoption of the resolutions of September 11, 1874, the insurance examiner for the state of Michigan, in his examination of the assets of the company, made some objection

to the form of the resolutions, and therefore, at a meeting of the directors held October 10, 1874, certain supplementary resolutions were passed, which, with the original resolutions, were declared to be the basis of the advance of assets made by Harding, McCoy & Pratt and Clark and Walker. The supplementary resolutions are as follows:

"It is further resolved, that in no event shall the interest be paid as stipulated in the second resolution aforesaid, except out of the surplus earnings of said company, putting the interest upon the same basis as to payment as the principal. It is further resolved, that nothing herein contained shall be held to modify or change the fundamental fact that the said above-described assets shall be the assets of the said company; and it is distinctly resolved that said assets must always be held to be the absolute property of said company, free and clear from any liens or claims thereon, and the same shall be held to be irrevocably pledged to the payment of all the creditors of said company. It is further resolved, that the phrase 'surplus earnings' contained in the second resolution aforesaid shall be strictly construed; and in no event shall any dividend be declared which shall reduce or impair the capital or assets of said company below the highest standard required in such cases to meet all liabilities, estimating reinsurance reserve according to the requirements of the various states in which the company does business."

From this time on, the insurance company continued to prosecute its business until its final collapse in 1876, but its history was marked by losses and financial embarrassments; and it is undoubtedly true that from time to time after October, 1874, Mr. Harding furnished moneys and securities to relieve the company from temporary difficulties. These moneys and securities which were advanced outside the resolutions of September 11, 1874, are known in the case and will be herein referred to as the defendants' "cash advances" to distinguish them from what has been spoken of as "the preferred debt." What was the amount of these cash advances is a much controverted question in the case, and one that will be considered hereafter. Mr. Harding continued to be the president of the company from the time of his election, August 25, 1874, until his resignation as both president and director was accepted on the 30th of August, 1875; and the records show that he attended all meetings of the board at which any business was done while he was such officer. In this connection it should be stated that it is claimed by Mr. Harding that he tendered his resignation as president August 19, 1875, but the record, which shows that his resignation was accepted on the 30th, must, I think, control.

In the summer of 1875—and probably in June—the insurance authorities of certain eastern states began to threaten to exclude the company from business in those states. In consequence of this new development in the affairs of the company, and for the purpose of averting its expulsion from the states referred to, Mr. Harding and Mr. Walker made a trip to the East, and had a conference with the state insurance authorities concerning the financial condition of the company. Nothing, however, was accomplished, except to secure time within which the company might retire from those states. Whether the defendant Harding then knew that the company was actually insolvent is a disputed question, but it can hardly be doubted

that he became alarmed, and believed its situation to be precarious. McCoy testifies that upon Mr. Harding's return from the East he came to his (McCoy's) house, and stated that he was satisfied the stock was worth nothing, and that they ought to shape the company so as to save the preferred claims. This is controverted, but it is very clear that steps were speedily taken to protect Mr. Harding against loss to the extent that the circumstances of the case and the situation of the company permitted. On the 24th day of July, 1875, he transferred to Clark and Walker the entire amount of his stock, $75,000, and received from them an assignment of the identical securities and moneys which Harding, McCoy & Pratt had delivered and paid to Clark and Walker on account of their original purchase of stock in July, 1874. The contract evidencing this transaction is as follows:

"This agreement, made this 24th day of July, A. D. 1875, by and between George K. Clark and Sidney P. Walker, of the first part, and George F. Harding, of the second part, witnesseth: That George F. Harding hereby sells to said parties of the first part seventy-five thousand dollars of the stock of the Globe Insurance Company. And said parties of the second part hereby agree, in consideration thereof, to sell and deliver to said George F. Harding the following moneys and securities which were put and placed in the hands of the Globe Insurance Company in the name of George K. Clark and Sidney P. Walker, as shown by resolution of the said company of September 30, 1874, to wit: 1st. Cash (greenbacks), twenty-five thousand dollars. 2d. Chicago, Burlington and Quincy R. R. bonds, ten thousand dollars. 3d. Burlington and Missouri River R. R. bonds, ten thousand dollars. (Said bonds being first mortgage bonds of denomination of $1,000 each, and twenty in number.) 4th. Mortgage of Lorin G. Pratt and Alexander McCoy, securing their note to the Globe Insurance Co. for thirty thousand dollars, described in said resolutions. It is further agreed that, inasmuch as said securities are all in the hands of the Globe Insurance Company, or subject to its control in the payment of the indebtedness of the company, and are, with said moneys, pledged for the indebtedness, or some part of it, of said company to policy holders, and hence cannot now be delivered to said Harding, and for like reason and other good reasons, said moneys cannot be paid to said Harding, it is therefore agreed that said stock shall be transferred to U. P. Smith as trustee, to be held by him in trust, to hold the same as security for the performance of this contract on the part of said first parties by the payment and delivery of said moneys and securities above referred to to said Harding; and, after that is satisfied, then in trust for E. R. Bowen, O. P. Axtell, and A. F. Fawsett, according to their several interests as hereinbefore stated. It is further agreed that said Harding shall receive from said parties of the first part, and each of them, a full and careful transfer and assignment of their several and joint or joint and several interests in said moneys and securities, which shall be delivered to him with this agreement; and careful and full obligations of said company shall also be obtained to deliver and pay said moneys and securities (or their value in money) to said Harding free and clear from all claims, demands, and equities whatsoever, save such obligations as are created by the contract of September 30, 1874, and the resolutions of that date forming part thereof, by and between said parties of the first part, or some of them, with said company; and that said parties of the first part shall unite in and take the proper steps to terminate the liability of said securities and moneys for future indebtedness or policies hereafter issued by said company, and to contract its business and reduce its capital so far as needed for that purpose. It is further agreed and stipulated that A. F. Fawsett is the owner of forty-four thousand dollars of said stock, that E. R. Bowen is the owner of twenty-one thousand dollars of said stock, and that O. P. Axtell is the owner of ten thousand dollars of said stock, and the same is to be delivered to them

as required, by and upon the conditions of the foregoing agreement; said stock being held and pledged as security in the hands of said Smith, trustee. for the delivery and payment to said Harding of said moneys and securities aforesaid. *It is further agreed that A. F. Fawsett shall resign his position as director of said company, and said Smith shall be elected in his place.* It is further agreed that said Harding and Smith shall hold the proxy of said Smith and of said Bowen, Axtell, and Fawsett, irrevocably, to vote and act and cast the votes entitled to be cast in the name of said Smith, as trus- tee, as the holders of said stock, at all future meetings of the stockholders of said company, until said moneys and securities are paid and delivered to him; and said Smith, in addition to executing this agreement as a proxy, shall also make and deliver to said Harding, at any time, on demand, a paper giving the same power to him and said Smith, in the same terms, to vote and act for him touching said stock. It is further agreed on the part of Asbury F. Fawsett, E. R. Bowen, and O. P. Axtell that they assent to this agreement, and will assist in carrying it out as far as their influence and votes go as stockholders and directors of said company, *and will look to said stock, so far as said insurance company is concerned, and not to said company, for the return to them of said stock or its proceeds.*

"[Signed] Geo. K. Clark. S. P. Walker.
"A. F. Fawsett. Geo. F. Harding."

"It is agreed by George F. Harding that he will look to Geo. K. Clark only for the return of so much of said securities as the pro rata of Fawsett stock bears to the whole, and this he does with the consent of S. P. Walker.

"[Signed] Geo. F. Harding."
"Consented to. S. P. Walker."

*The portions marked (\*) were apparently erased by pencil lines after the contract was drawn, before execution.

The transfer from Clark and Walker is as follows:

"For value received, we jointly and severally assign and transfer to Geo. F. Harding the following moneys and securities, and all our right under and to the same, to wit:

First. Cash, greenbacks.................................... $25,000
Second. C., B. & Q. R. R. bonds.............................. 10,000
Third. B. & M. R. R. bonds.................................. 10,000
Fourth. Mortgage of McCoy and Pratt........................ 30,000

—Described in the resolution of September 11, 1874, of the Globe Insurance Company, and being securities for the preferred stock, so called, of said com- pany; the intention being to place said Harding in the same position touch- ing the same, with all the rights touching the same under said resolutions, occupied by any or either of us, and especially of the said Clark and Walker; and we request said insurance company to treat said Harding as the owner of the same. July 24, 1875."

In fact, Mr. Harding never got from Clark and Walker or the company any of these identical securities and moneys, for they had been already used by the company, and were beyond its control or that of Clark and Walker. But he did get by this transaction all of Clark and Walker's interest in the so-called preferred debt, for the property thus assigned to him consisted of Clark and Walker's advances under the resolutions of September 11, 1874.

Following up the transactions of the parties and of the company in their historical order, it is found that on the 29th day of July, 1875, a meeting of the board of directors of the company was held, at which the following resolutions, which the secretary's record states were offered by Mr. Harding, were adopted:

"(1) Resolved, that the moneys and securities advanced under the resolu- tions of September 11 and 30, 1874, be returned to the parties from whom

the company received them, as soon as the obligations contracted on the faith of them shall be paid. (2) Resolved, that the company will make no claim to set off indebtedness of said parties to said company against the said securities and moneys on the obligation to return the same, but will recognize the right of them or their assigns to the same, without set-off, diminution, or discount. (3) Resolved, that no more obligations of any kind be contracted on the faith of said securities and moneys, but said contract touching the same be regarded as terminated so far as future obligations of this company are concerned, and immediate steps be taken to enable the company to return the same, and stop the payment of interest thereon. Also, whereas, A. F. Fawsett, O. P. Axtell, and E. R. Bowen, acting by Geo. K. Clark and S. P. Walker, put into the Globe Insurance Company certain securities and moneys under the terms of the resolutions of September 11 and 30, 1874: Now, therefore, resolved, that said moneys and securities be returned, as soon as the terms of said contract are completed, to the said Fawsett, Axtell, and Bowen, in the proportions of $44,000 to Fawsett, $21,000 to Bowen, and $10,000 to Axtell, provided the claims of all creditors of Clark and Walker against the same be first discharged and defeated. And whereas, the losses by fire of the company in July, 1874, impaired its capital stock to a sum exceeding twenty-five per cent. thereof; and whereas, on September 11, 1874, the company resolved to make good said impairment, and undertook so to do on September 30, 1874, by an advance then made to this company of securities and moneys by parties in interest as will more fully appear by the records of this company of September 11 and 30, 1874; and whereas, objections have been made to said mode of making up said impairment, and it is deemed advisable to terminate the same, and to proceed under the general insurance law of this state by first reducing the capital stock, and gradually returning, as fast as good faith will admit, the moneys and securities so advanced, and then increase the capital stock as soon as possible: Therefore resolved, that the capital stock and par value of the shares of the Globe Insurance Company be reduced to $200,000, and that the auditor of public accounts of the state of Illinois be requested to make an examination of its affairs, and grant a certificate that it is proper, and is justified by the property and assets of said company, to reduce the capital stock and the par value of the shares of said company to said sum."

Then, on the 12th day of August, 1875, at a meeting of the executive and finance committee, a committee consisting of Messrs. Clark and Kimball was appointed "to confer with Mr. Harding in regard to disposing of preferred debt and his account." It is claimed by complainants that a settlement was immediately negotiated between Clark, acting for the committee, and Harding, of the latter's entire account, including "preferred debt" and cash advances, and this claim is supported by the testimony of Clark, which, in substance, is as follows:

Witness says he was on that committee. Mr. Kimball was also on the committee, but gave it no attention. "I transacted the business of the committee. Met Harding on the subject of his account, which embraced his interest in the preferred debt and his cash advances. This resolution was passed in order to get a settlement with Harding. I had previously had a number of interviews with him relative to his account. Mr. Harding was anxious to get some pay for what he had put into the company. He became alarmed about its solvency, and the matter of a settlement had been talked over before the committee was appointed. It was talked over directly after he had acquired Clark and Walker's rights under the resolutions. We had a number of conversations on the subject as to how it could be done. We could not pay him back in kind. The money had been expended in paying losses. The cash securities had been hypothecated for nearly all they were worth, and paying him back in kind was out of the question. But he expressed a willingness to accept other securities in place of those that had been put in, and a committee was appointed to agree upon values and ad-

just the matter. That was the object of the committee. His claim was, the entire Clark and Walker preferred account, $75,000.00; amount put in by himself under the resolutions, $51,718.75,—total preferred debt, $126,-718.75. In addition, he claimed somewhere from $9,000 to $12,000 cash balance. This was exclusive of the interest provided for by the resolutions, the profit on the stock he purchased, and a little discrepancy between the railroad bonds which he had furnished to the company of $24,500 and $21,918.75,—$2,591.25,—as before explained. Met Mr. Harding at his residence on Indiana avenue, in the evening, in the latter part of August, 1875, on the matter. No one present excepting Harding and witness. No other member of the committee was there. Made settlement of his account at that time. I can give basis of settlement, the details of which were subsequently substantially carried out. Q. 91. Well, give us the basis. A. By the terms of the settlement Harding was to receive of the company certain of its securities at fixed values, to be agreed upon between the committee and Harding, in payment of his entire claim against the company. Values were fixed between Harding and myself at that interview upon the following securities then owned and held by the company:

| | |
|---|---:|
| The Westcott notes and mortgage for $52,500 and interest at.... | $ 55,000 |
| The Michael Smith mortgage at.............................. | 18,000 |
| The O. Huse mortgage at.................................... | 2,000 |
| The John F. Heaney mortgage at............................ | 6,000 |
| The W. S. Waller mortgage at.............................. | 9,000 |
| M. O. Walker mortgage for $10,000 and interest simple, unsecured note $2,500, at........................................ | 15,000 |
| McCoy and Pratt's mortgage (which had previously been taken by Harding) ............................................... | 30,000 |
| Total .................................................... | $135,000 |

"This amount, with the Great Western Telegraph bonds, valued at $1,800, about covered his entire indebtedness, except the interest on the preferred debt, as provided in the resolutions, and the profit on the stock he had purchased."

Mr. Harding denies that this alleged settlement was effected between himself and Clark as thus testified to by Clark, or that any securities were then delivered to him, or that there was any settlement prior to the 30th August following. Whatever the facts may be in that regard, and so far as this issue in relation to the time and manner of the settlement is concerned, it will be considered hereafter. It appears on the 30th of August, 1875, there was a meeting of the board of directors, at which Mr. Harding presented his resignation as president, as before stated, and at which the following resolutions were adopted:

"Resolved, that the settlement made by the executive committee with Geo. F. Harding be approved with the following corrections, viz.: That the actual value of bonds and stock shall be allowed Mr. Harding, instead of the price at which the same were allowed; second, that Mr. Harding shall take $1,800 of telegraph bonds at par; third, that the interest account of said Harding shall be calculated correctly, and such amount shall be allowed him in place of the item as reported."

It appears next that at a second meeting of the directors, held, as the records show, on the 30th day of August, the following resolution was passed:

"Resolved, that the president and secretary of this company be directed to make the note of this company payable on demand after its date to Geo. F. Harding, for the sum of ($47,743.52) forty-seven thousand seven hundred and forty-three and fifty-two one-hundredths dollars, due to him for cash advanced to said company, and secure the same by the following

collaterals, to wit: The notes' of Geo. K. Clark, payable to the Globe Insurance Company, two in number, dated December 28, 1872, due five years after date, with interest at 8 per cent., payable annually, secured each by trust deed, one for each note, made by said Clark and wife to Sidney P. Walker, trustee, conveying certain premises therein described; also the note of said Clark payable to said company, of same date and tenor, secured by trust deed made by said Clark and wife conveying premises owned in fee by his wife to said trustee,—all three of said notes being for the sum of $5,000 each; also two notes made by said Clark to said company, dated March 11, 1873, payable five years after date, with 8 per cent. interest per annum,—one for the sum of $4,000, and the other for the sum of $8,000,— each secured by trust deeds, one for each note, conveying certain premises to Walker, as trustee; also a note of said Clark to said company, dated July 1, 1873, payable five years after date, with 8 per cent. interest, payable semiannually, for $4,000, secured by a trust deed conveying certain premises to said Walker, as trustee; also two notes of said Clark, made to said company, dated March 9, 1874, payable five years after date, with 8 per cent. interest, payable annually; one for $15,000 and one for $2,000, each secured by independent trust deeds, conveying certain premises to said Walker, as trustee; also a note of said Clark to his own order, dated August 13, 1874, payable five years after date, with interest at 8 per cent., payable semiannually, for $40,000, secured by a trust deed to Alex. McCoy, as trustee, and assigned and indorsed by said Clark; also eleven notes made by Elmer F. Westcott to Asbury F. Fawsett, for $47,772.73 each, due on or before three years from date, with interest at 8 per cent. per annum, and the mortgage securing the same on the premises therein described; also the note of Michael Smith to the Globe Insurance Company for $20,000, dated December 13, 1871, and payable on or before April 1, 1873, with interest at the rate of 8 per cent. per annum, payable annually, and the sale mortgage securing said note, $4,000, having been indorsed thereon; also the note of Obadiah Huse to said company for $2,000, dated March 25, 1873, five years after date, with 8 per cent. interest, payable annually, and the trust deed securing the same; also three $1,000 bonds of the Omaha & Southwestern Railroad Company and six $1,000 bonds of the Wisconsin Valley Railroad Company; also the note of W. S. Waller to Geo. K. Clark, dated September 16, 1873, for the sum of $8,500, payable one year after said date, with interest at 8 per cent. from date, and the trust deed securing the same; also the note of M. O. Walker, now deceased, in favor of said company, dated March 24, 1871, for the sum of $10,000, due five years after date, with interest at the rate of 6 per cent. per annum, payable annually, and the trust deed or mortgage securing the same; also the note of M. O. Walker for $2,500, to the order of said company, dated September 24, 1872, payable on or before August 1st after date."

These securities thus to be transferred as collateral to the demand note amounted on their face to over $200,000, and, as it will be observed, were to secure the payment of a note of about $47,700. The demand note was immediately executed, and the collaterals were delivered. It was at this time, as the defendant Harding claims, that a settlement was made. Just what items made up the amount of the demand note is not clear. The testimony of Clark is to the effect—and this is the claim of complainants—that the object of the several transactions before recited was to secure to Harding the payment of the entire amount of the so-called preferred claim and cash advance, and that, after crediting the company with the mortgages and securities alleged to have been turned out to him in settlement prior to the meeting of August 30, 1875, there was, on account of interest and some other items, a balance due him of about $37,000, which balance, for some reason unexplained by Clark, and apparently not understood by him, was ultimately

fixed at $47,743.52; that for the purpose of perfecting his title to the securities alleged to have been previously delivered to Harding in settlement by a sale under the power that should be annexed to the demand note it was arranged that such a note should be given. In his testimony on this point Clark says:

"It was a subject that was talked there for quite a while,—canvassed very frequently between us. I really wanted to accomplish it; that is, if he wanted to better his title to his securities by a sale under the power in the demand note, I was willing he should do it. If he got into any litigation or trouble [which he seemed to anticipate], why, he wanted to be in a position where he could set up his moneyed claim against the company, and hold these securities until that was paid. That was the conversation between him and me."

All this Mr. Harding denies. His version of the transaction is as follows:

"There was a settlement made at that time. One of the first things done was for Mr. Walker to produce my account. He did produce an imperfect and incomplete account, amounting to $12,000 and over. It was on a small book, not on the books of the company. After producing the vouchers and discussing the matter, it was found that my account would have to be swelled from that amount to somewhere from $25,000 to $30,000, and the C., B. & Q. R. R. stock would swell the amount to about $35,000. Then there was interest computed upon my cash advances, which in all amounted to $42,000 or $43,000, I think. Then the amount of interest was counted over again, and computations made, and coupons collected, and the premiums on the bonds, all amounted to the sum of $47,000. I was willing to take their notes, so far as they were ready to give them to me, upon my cash advances, claiming that there was a larger sum still due me upon my cash advances alone. This was on August 30, 1875."

On the 31st day of August—the day after the demand note was made—Mr. Harding gave to the directors of the company the following notice:

"August 31, 1875.

"To the Board of Directors of the Globe Insurance Company: You will please take notice that as a stockholder, as a creditor, and as a party interested in the advances made under the resolutions of September, 1874, I protest against and object to the surrender and delivery to any individual of the securities, or any securities in lieu thereof, of those formerly given to the company or held by the company under the resolutions of September, 1874, holding and claiming that the honor and good faith of this company is pledged to retain the same until the terms of the contracts under which they were delivered shall have been satisfied; and I inform all parties in interest that I do not and will not waive any rights which I may have to look to said securities for the payment of any moneys due me.

"Yours truly, George F. Harding."

The demand note contained the usual form of sale found in collateral notes, and in October, 1875, Mr. Harding sold the collateral securities to one Hough, a lawyer in Chicago. The substance of Hough's testimony relating to the sale is this:

"Somewhere in the fall of 1875,—I should think in October,—he (Harding) asked me to purchase some securities. I am unable to state in detail what the securities were. Could not tell the amount precisely, but it was somewhere, I think, between $150,000 and $200,000. They were notes secured by mortgage. My recollection is that Geo. K. Clark figured more than any one else in these securities. One mortgage was by Mr. Smith. Don't recollect the amount of the Clark or Smith mortgages. Harding had the notes and mortgages in his office in the Kent Building. I had possession of the

securities two or three months, perhaps. I should not say it was over three months. The circumstances under which I purchased were these: Harding told me he had some securities that he wanted to sell me, and he showed me the securities. I looked them over, and told him I had no money to purchase them, and he said I need not pay any money; he would take my note. I asked him if the securities were good, and he said they were. The note is destroyed. My recollection is that it amounted to something over $60,000. That is a mere impression upon my mind. I can't recollect more definite than that it was payable to Harding's order, and, I think, was due some six months after date. I sold the mortgages back to Mr. Harding. Neither of the sales (Harding to Hough or Hough to Harding) was public. Both were private sales. In payment he surrendered to me my note, and gave me $250; that is, he allowed it to me on a claim that he had against me. I don't recollect anything more that he said except that he wanted to buy those securities. It took place at his office. It was some time in the winter of 1875–76. Harding and I were officing in the same suite of rooms at the time I purchased; also at the same time I sold back the securities. I put up no collateral with my note. I understood that, if Mr. Harding wished to buy those securities back, that I would let him have them. Harding stated that he might want to purchase them back, and I said he could have them back if he wanted them. I don't think I should have purchased them and given the note if I had expected to keep the securities and meet the note, but I was abundantly secured in giving my note. It was the understanding on my part, that Harding was to purchase them back. He did not exhibit to me any collateral note under which he held them. I think he said he got the securities from the Globe Insurance Company. (Witness is shown the resolution of August 30, 1875, giving a list of the securities said to be collateral to the demand note, and recognizes the general character of them as the same with those he bought of Harding.)" Cross-examination: "Q. Didn't Mr. Harding, at the time of this sale, tell you that he could not and would not have any understanding with you whatever of any kind that would invalidate the sale, and could not and would not have any understanding with you, but that he wanted to make a sale of the property, and that it was a good purchase, and you were to hold the property? Wasn't that the understanding? Wasn't that the statement? A. I think there was some conversation substantially to that effect."

This sale to Hough and the sale back to Harding the complainants insist was a sham proceeding, by means of which Harding sought to strengthen his own title to the collateral securities, while Mr. Harding claims that it was a fair and valid sale, without any understanding at the time that he would buy the securities back. Difficulty arose, according to the testimony of Mr. Harding, in transferring the collaterals, as they did not bear the indorsement of the company. Thereupon Mr. Harding applied to Mr. U. P. Smith, then president of the company, for indorsement of the securities, and, as he hesitated to indorse them, Mr. Harding wrote him the following letter:

"Chicago, October 4, 1875.

"U. P. Smith, Esq., President of Globe: I respectfully request the indorsement of the notes and mortgages described in my demand note of August 30, 1875, and the guaranty as to such of said paper as I hope to get on without putting Globe indorsements upon. My object in this is, I wish my titles to the collaterals to be perfected. I have sold them all, and wish to deliver them to the vendee. As I have advised Mr. Clark and others, I will buy the Clark mortgages of the vendee, and will sell them to the Globe for the amount of said demand note, and I will give you an opportunity to pay for them by giving me the Globe paper with them as collateral, due in two, four, six, and eight months from September 30, 1875, as a condition of confirming the title of my vendee to said collaterals. I will, upon said contracts

above described being made and carried out, give to said company a receipt in full for my advances under the agreement of September, 1874, containing the condition that the title of my vendee to said collaterals stands good and is unimpeachable.

"[Signed]                                    Geo. F. Harding."

The securities were then indorsed, and upon their purchase from Hough Harding sold back to the company the Clark mortgages, taking from the company its four notes, all dated September 30, 1875, one for $6,940.38, one for $7,239.16, one for $12,609.99, and one for $23,485, due respectively in two, four, six, and eight months, and all aggregating $50,274.53; and says that he gave a release of the company's liability to him under the agreement of September, 1874. Following the alleged sale to Hough it appears by the secretary's record of the company that on the 12th day of October, 1875, there was a meeting of the executive and finance committee, at which the following resolution was passed:

"Resolved, that the secretary of this company give to George F. Harding a proper voucher to show the sale of the securities pledged to him on August 30, 1875, which sale was made to David L. Hough on the 9th day of October, 1875, is approved and consented to by this company on conditi n only that said Harding shall purchase back from said Hough the securities called the 'Clark mortgages,' and shall release the company from all liability to him under the agreements of September 11 and 30, 1874, and shall accept the notes of this company to be made to him for the following sums, to wit [enumerating the four notes last before mentioned]; said notes bearing interest at ten per cent. per annum after maturity, and to be paid when due at the expiration of the several periods as above stated; and shall resell said Clark mortgages for the total amount of said notes, taking said Clark mortgages as collateral security; and the said secretary and president of this company are hereby authorized and empowered to make said notes to said Harding, and also the several parts of the above transaction."

Then there appears on the secretary's book the record of a meeting of the directors held October 13th, reciting in detail the giving of the demand note in obedience to the resolution of August 30th, with the collaterals mentioned in that resolution; a report by the secretary that by order of the executive committee dated October 12, 1875, he had signed a paper approving of the sale by Harding to Hough; and a report by the president and secretary that they had negotiated the purchase from Harding of the Clark securities for the sum of $50,274.53, being the amount of purchase, with interest added to maturity of the notes which were given for the purchase; and the record then proceeds:

"Now, therefore, it is moved and seconded that the above report of the action of the executive committee of this board and also of the president and secretary be accepted, and that the same is hereby fully approved."

The company not paying the four notes given for the Clark securities, those securities were sold for the sum of $20,635.07, Mr. Harding being the purchaser. Thus he acquired by virtue of this transaction, and by virtue of the proceedings in connection with the demand note, the entire body of securities which it is sought by the present bill to compel him to surrender and account for for the benefit of policy holders who are now unpaid creditors of the Globe Insurance Company.

### Immaterial Matters.

In considering the case in its legal bearings and in the light only of material facts, it is evident that there may be eliminated therefrom a number of matters upon which considerable testimony has been taken. Among other things, it is disclosed that in the course of proceedings taken by Mr. Harding in connection with his withdrawal from the company, and to secure an adjustment of his supposed rights, controversies arose between himself and McCoy and Pratt, which have been made the subject of much discussion in this investigation. It was probably unavoidable that in developing the details of the various transactions involved this should be somewhat prominently brought out, but I regard the difficulties which arose between the parties named as quite extraneous to the issues here to be settled, except as the relations which were engendered between them may affect their credibility as witnesses. Again, there is much testimony in the case relative to the so-called Fawsett mortgage, which I understand to be the South Chicago Land & Building Association mortgage. From what was said upon the argument in relation to this mortgage and the litigation between Fawsett and Harding concerning it that has occurred since the present bill was filed, I conclude that the controversy between those parties touching the ownership of that mortgage has now no relevancy to the present contention. Further, it appears that on the 5th day of March, 1876, the insurance company gave to the defendant Harding its note for $7,640.75, with certain notes and trust deeds, executed by Dewey and Lay as collateral security. The items of which this note was made up appear in an account annexed to the original answer, marked "Exhibit 4"; and it is to be further remarked that the debited part of the same items appear under date of March 5, 1876, in the defendant's corrected account as shown in his amended answer. Reference is only made to this note of $7,640.75 and to the items of which it was composed for the purpose of observing that no claim is made by complainants on account of them nor to the Dewey and Lay securities, and this note and the securities may be regarded as out of the case.

### The Bradner, Smith & Co. Decree.

The question first encountered on the threshold of this case is, are complainants' rights barred by the proceedings in the suit of Bradner, Smith & Co. against the Globe Insurance Company and others, which was commenced and prosecuted in the state court in 1876? The bill in the case at bar was filed in this court May 5, 1876. The original complainants therein were Cynthia C. Hart and John S. Hart, judgment creditors of the insurance company, and the defendants were the Globe Insurance Company, the Firemen's Insurance Company, George F. Harding, and V. A. Turpin. The return of the marshal shows service of the subpœna of the Globe Insurance Company, George F. Harding, and the Firemen's Insurance Company May 13, 1876, and on V. A. Turpin May 24, 1876.

All of the defendants, however, except Turpin, appeared and answered the bill on the 9th day of May, 1876, so that on that day this court acquired jurisdiction over the answering defendants. On the same 9th day of May this court appointed Robert E. Jenkins receiver of the insurance company, and on the 12th day of May, 1876, in obedience to the order of the court, the company executed to the receiver an assignment of all its property and effects. On the 13th day of May, 1876, the Erie & Western Transportation Company intervened as a judgment creditor of the insurance company, and was made a party to the suit. On or about the 2d day of October, 1876, leave was also granted to Jenkins, as assignee in bankruptcy of the insurance company, to intervene in this suit, and on the 15th day of July, 1878, an order was entered making him a co-complainant therein. On the 5th day of January, 1877, the suit was dismissed as to the Firemen's Insurance Company, and on the 15th day of February, 1877, the defendant Harding filed an amended and supplemental answer to the bill. This was the state of the record in the case at bar, so that in 1876 the parties thereto were Cynthia C. Hart and John S. Hart, complainants, the Globe Insurance Company, the Firemen's Insurance Company, George F. Harding, and V. A. Turpin, defendants, Robert E. Jenkins, receiver, and the Erie & Western Transportation Company, intervening judgment creditor. On the 3d day of May, 1876, Bradner, Smith & Co., who were simple contract creditors of the insurance company, never having obtained judgment, filed in the circuit court of Cook county a bill which was in the nature of a creditors' bill against the Globe Insurance Company. Their claim, as set out in the bill, was one arising upon a loss by fire of property insured by the insurance company, which was the sole defendant in the cause. The Globe Insurance Company entered its appearance on the 4th day of May. On the 8th of May the complainants in the cause asked leave to file an amended bill making new parties defendant, and an order was on that day entered granting leave to file such amended bill as of May 5th, and an amended bill was filed as of the last-named date making George F. Harding, the Firemen's Insurance Company, and V. A. Turpin codefendants in the suit with the Globe Insurance Company; and Mr. Harding, by W. A. Barnes, his attorney, and the Firemen's Insurance Company, accepted service of the summons issued on the amended bill as of the 5th day of May.

At this stage of the proceedings the apparent object of the suit was to reach the property and assets of the Globe Insurance Company in its possession and in the possession of the other defendants, and to obtain a decree that the same be applied in satisfaction of Bradner, Smith & Co.'s demand. On the 8th day of May the complainants in that suit moved for the appointment of a receiver of the Globe Insurance Company. On the same day the Erie & Western Transportation Company entered its appearance for the sole and only purpose of opposing said motion. The motion was overruled. On the 23d day of May, 1876, Harding and the Firemen's Insurance Company filed answers to the original and amended bills, which simply denied the allegations therein, and alleged the facts

of the case to be as set forth in their several cross bills filed on the same day. The defendants in the cross bill of Mr. Harding were Bradner, Smith & Co., the Globe Insurance Company, Isaac Crosby, First National Bank of Chicago, Treasurer of the State of Mississippi, the Firemen's Insurance Company, V. A. Turpin, Robert E. Jenkins, receiver of the Globe Insurance Company, and Frank A. Follansbee, receiver of the Mercantile Insurance Company. The matters set up in this cross bill were substantially such as are interposed as a defense in the case at bar, and affirmative relief against the Globe Insurance Company was prayed. On the 27th of May, 1876, Bradner, Smith & Co. disposed of their claim against the insurance company, upon which the suit was founded, and received on account thereof $100. Their interest in the litigation then terminated. The assignment was executed in blank, and the transaction was conducted by J. C. Latimer, who was the solicitor of record for Bradner, Smith & Co. in the bill filed by them against the insurance company. Latimer testifies that he presented the assignment to Smith for execution, and paid him $100, which he received for the purpose from Barnes, who, I infer, was the same person who, as attorney for Mr. Harding, accepted service of the summons that was issued upon the amended bill filed by Bradner, Smith & Co. against the Globe Insurance Company, Mr. Harding, and others. Latimer further testifies that Barnes also paid him attorney's fees in addition to the $100, on condition that the suit could be prosecuted in the name of Bradner, Smith & Co. to a decree in their favor; and it clearly appears that thereafter they incurred no expense in the suit and realized no benefit therefrom. On the 7th day of June, the Globe Insurance Company filed nunc pro tunc, as of June 1st, its answer to the original and amended bills of Bradner, Smith & Co., which consisted of a denial of the allegations in the original bill, and also a denial that the complainants were entitled to the relief prayed by them either in their original or amended bill. On the 21st day of June Mr. Harding filed an amendment to his cross bill, correcting and amending the latter in various particulars, and among other things striking out the names of Isaac Crosby, First National Bank of Chicago, Treasurer of the State of Mississippi, V. A. Turpin, Robert E. Jenkins, receiver of the Globe Insurance Company, and Frank H. Follansbee, receiver of the Mercantile Insurance Company, and the Firemen's Insurance Company. Thereafter the defendants in that bill were Bradner, Smith & Co., the Globe Insurance Company, and the Firemen's Insurance Company. On the 31st day of May the Firemen's Insurance Company filed its cross bill making the same parties defendants therein as were originally named in the cross bill of Mr. Harding, in which cross bill it was alleged that the Firemen's Insurance Company had contracted to reinsure certain risks on policies issued by the Globe Insurance Company, in consideration of the payment to it of certain sums of money by the last-named company; the payment of which was secured by certain notes and collaterals delivered to the reinsurer; and the prayer of the cross bill was, among other things, that the validity of said contract of reinsurance might be determined,

and that the rights of the complainant in said cross bill in and to such assets as it claimed by virtue of the contract of reinsurance might be confirmed. On the 21st day of June this cross bill of the Firemen's Insurance Company was amended by striking out the names of the same persons as defendants therein as were struck out of the cross bill of Mr. Harding, including Robert E. Jenkins, receiver of the Globe Insurance Company. Answers to the cross bill of Mr. Harding, denying its allegations, were duly filed by the Globe Insurance Company and the Firemen's Insurance Company. Mr. Harding and the Globe Insurance Company also answered the cross bill of the Firemen's Insurance Company, denying the allegations thereof, and a similar answer was also filed in the name of Bradner, Smith & Co. Final issue was joined by replications to the various answers to the original and cross bills, and a decree was entered on the 22d day of June, 1876. That decree was in favor of Bradner, Smith & Co. for the sum of $987.77, and in favor of Mr. Harding, confirming his transactions with the Globe Insurance Company, and adjudging that there was still due to him from that company $32,512.65, and that upon nonpayment of that sum, the securities referred to in his cross bill be sold by a master in chancery, at public auction, to the highest bidder. The decree also confirmed the contract of reinsurance made with the Firemen's Insurance Company, and adjudged that it was entitled to be paid $44,000 on account of such reinsurance, and to hold the securities transferred to it by the Globe Insurance Company to secure the payment of said sum. On the 1st day of July, 1876, Robert E. Jenkins, receiver of the Globe Insurance Company, moved to vacate this decree, but on the 8th day of the same month he withdrew his motion. On the 12th day of October, 1876, a further decree was entered, directing a sale of the securities held by the Firemen's Insurance Company, and appointing George Willard receiver of the assets and effects of the Globe Insurance Company. On the 16th day of October, 1876, the master appointed to make sale of the securities referred to in Mr. Harding's cross bill, consisting of certain of the Clark mortgages amounting to $32,000, reported that he had sold the same to Mr. Harding for the sum of $10,000. On the 16th day of November, 1876, the master also reported the sale of the property and securities mentioned in the decree of October 12th, from which report it appears the aggregate amount realized from said sale was $805, and that Mr. Harding was the purchaser of most of the securities and property. Subsequently final orders were made confirming these sales and directing delivery of the securities and property sold by the master, to the purchaser.

Various points are urged in support of and against the claim that all matters involved in the case at bar were duly adjudicated in the Bradner & Smith case, and that the present complainants, including all other creditors of the Globe Insurance Company and their representatives, are bound by the proceedings in that case. It is true that this court acquired jurisdiction of the defendants named in complainants' bill on the 9th day of May, 1876, and that the defendants in the amended bill of Bradner, Smith & Co. be-

came parties to that case, certainly on the 8th, and perhaps on the 5th, day of May. But, admitting this to be the state of the record, and saying nothing about other objections urged against the proceedings referred to, I regard the fact that neither the complainants in the case at bar nor any of the creditors of the Globe Insurance Company, except Bradner, Smith & Co., Mr. Harding, and the Firemen's Insurance Company, nor the representatives of the creditors, were parties or privies to the Bradner, Smith & Co. case, as a conclusive answer to the defense here made that the present suit is barred by the proceedings and decrees in that case. Any other conclusion is, to my mind, unsustainable upon any correct principles of law applicable to the question. The Harts, the great body of general creditors of the Globe Insurance Company, and the receiver of the company appointed by this court were strangers to the litigation in the state court. Even Bradner, Smith & Co., four days after Mr. Harding filed his cross bill, ceased to have any further interest in that litigation, and it is patent that thereafter the real parties to that suit were Mr. Harding, the Firemen's Insurance Company, and the Globe Insurance Company. Mr. Jenkins was appointed receiver by this court in the case at bar on the 9th day of May. The appointment of a receiver in the Bradner & Smith case was refused by the state court until October 12, 1876, when George Willard was appointed such receiver. The receiver appointed by this court in this cause was never brought in as a party to the suit in the state court; and before all the decrees were entered in the last-named suit the Globe Insurance Company was in bankruptcy, and the assignee, Mr. Jenkins, who subsequently became a co-complainant in the case at bar, was not made a party to that suit. It will not do to say that the bill of Bradner, Smith & Co alleged that it was filed in behalf of all the creditors of the Globe Insurance Company, and therefore that they became bound by the proceedings in that case. Parties cannot be bound or tied up in their rights in that way. Nor will it do to say that the parties to the present suit might have come into the suit in the state court. They were not obliged to do so; and, if the parties to that litigation were seeking an adjudication that should be conclusive against the world, it was their duty to make all parties in interest parties to the suit. It is true that the record in the Bradner, Smith & Co. case shows that the Erie & Western Transportation Company at one time intervened for the sole purpose of resisting the appointment of a receiver by the state court, and that, after decree passed, Mr. Jenkins, as receiver, intervened by motion to vacate the decree. But the latter motion was withdrawn, and neither of these proceedings on the part of the transportation company and Jenkins connected them with the suit, so as to bind them as parties privy thereto. It is evident also that the real subject-matter of the Bradner & Smith case, which formed the substantial basis of the decrees which were ultimately entered, was introduced into the case by the cross bills of Mr. Harding and the Firemen's Insurance Company; and these cross bills were filed a considerable time after those parties had answered the bill of complainants in the case at

bar, by which the same subject-matter was here brought into controversy. So that it is perhaps a serious question whether this court did not first take cognizance of the real controversy between the parties which the state court subsequently undertook to adjudicate. Further, an examination of the record in the Bradner & Smith case shows, I think, that the decree in that case did not assume to reach a large mass of the securities in controversy in the case at bar. That decree could only embrace such matters as were germane to the issues raised by the bill and cross bills and the answers thereto, and those issues, I think, only legitimately involved the Clark mortgages and such securities and property of the Globe Insurance Company as were held by the Firemen's Insurance Company. Without considering any other points made involving the validity of the proceedings in the Bradner & Smith case than such as control my decision of the question, I am of the opinion that those proceedings and the decree rendered in that case ought not to be adjudged a bar to the relief sought by complainants in the present bill.

### Secretary's Records.

As a preliminary matter it should be remarked that the correctness of the secretary's records touching various proceedings of the board of directors and the finance committee has been quite seriously disputed by some of the witnesses. This dispute, on the one hand, involves a denial on the part of Mr. Harding that the record correctly sets forth the amount of his advances under the resolutions of September 11th, and, on the other hand, it involves the accuracy of the proceedings, as recorded, relative to the giving of the demand note, the alleged approval and confirmation of the sale to Hough, and the transaction concerning the resale of the Clark mortgages by Harding to the company. And it is claimed in behalf of the complainants that the record of the latter proceedings is fictitious and false, and was made up without the knowledge of the members of the board, whom the record states participated therein; and that the intention was to fabricate a record which should, on its face, attempt to give regularity to proceedings between Harding and some of the officers of the company, which were in fact, as it is claimed, illegal and irregular. But I think the testimony is hardly sufficient to impeach the records. It is true Mr. Pratt says he did not offer the resolution in relation to giving Harding a demand note, and other members of the board have no recollection of proceedings relative thereto, and of the recorded action of the board touching the Hough sale, and the resale to the company of the Clark mortgages. But some of the witnesses who thus dispute the correctness of the records, admit that there was talk in the board, or among its members, about giving a demand note, and that it was understood that such a note was to be given; and it is to be borne in mind that a considerable time has elapsed since the transaction in question, and that, of necessity, the alleged nonexistence of the disputed proceedings rests in the recollection of the witnesses, which, after such lapse of time, may be unreliable. The

alleged proceedings appear to have been recorded in the usual manner and form by the proper officer, and, after careful examination of the records and evidence, I am not convinced that the records have been impeached, and they will be regarded throughout as evidence of the transactions between Mr. Harding and the board. According to the paging of the book of records, it appears that some of the leaves are missing, and it was claimed by complainants' counsel that this was strong evidence of improper tampering with the book. But there is no proof to show whether the missing leaves were intentionally or accidentally removed, nor by whom, nor is it shown that they were in the book when its use as a book of record was begun, and on the whole I think there is an entire failure to show that the imperfection of the record in the particular referred to is chargeable to the defendant.

## Effect of Resolutions of September 11 and 30, 1874.

It is too clear for argument that the money and securities put into the treasury of the company and made part of its capital by Clark and Walker and Harding, McCoy & Pratt under the resolutions of September 11 and 30, 1874, were pledged beyond recall, if the situation of the company should so require, to the payment of indebtedness to policy holders. The object of those advances was to put the company on a sound financial basis, so that it could hold itself out to the world as able to meet its engagements with those who should thereafter trust to the security against loss which its policies of insurance might afford. The resolutions of September 11th declared that the assets required to overcome impairment and to properly conduct the business should be held by the company, subject to the payment of all indebtedness of the company to policy holders; and the resolutions of September 30th asserted that the securities received from Clark and Walker and Harding, McCoy & Pratt, amounting to $144,918.76, were accepted and held in conformity with the resolutions of September 11th. Again, in the supplementary resolutions of October 10th it was declared that nothing therein contained should be held to modify or change the fundamental fact that the assets advanced to remedy impairment should be the assets of the company, and it was therein resolved that they must always be held to be the property of the company, free from any liens or claims thereon, and irrevocably pledged to the payment of all the creditors of the company. Mr. Harding participated in these proceedings. He, of course, understood the conditions under which he and his associates made their advances of money and securities; and we find him as late as August 31, 1875, as an alleged creditor of the company, by letter to the directors, invoking the rule of action which was plainly required by the resolutions of September, 1874. It is true that the resolutions of September 11th contemplated the ultimate return of the advances made under the resolutions to the parties making them. But it was meant and understood that such return could be made only in case the assets so advanced were not required to meet the obligations of the company. It is clear, therefore, that when the com-

pany fell into a condition of insolvency neither Clark and Walker, nor Harding, McCoy & Pratt, nor either of them, could, by any arrangement whatever with the company, withdraw the moneys and securities put in under the resolutions, nor could they withdraw other securities in place of those they originally contributed, if such withdrawal would weaken the power of the company to meet its liabilities to policy holders, without violating the spirit of the resolutions of September, 1874.

### The Meaning and Legal Effect of the Transactions in Dispute.

Now the great question in the case is, what were the real meaning and purpose of the transactions which took place between the defendant Harding and the company in July and August, 1875, and what was, in fact, accomplished thereby? The court can have no doubt, in the light of all the facts and circumstances developed by the evidence, that before and at the time of the meeting of the directors July 29, 1875, Mr. Harding regarded the situation of the company as precarious, and believed that his interests were in jeopardy. It is true that he says the books of the company were so kept that no one could tell its condition. But Walker, the secretary, testifies that they were purposely thus kept to prevent interference by state officials; and, as Mr. Harding was president of the company, and a member of the finance committee, it may be a question whether, under the circumstances, he was not in law chargeable with knowledge of the company's affairs and situation. However that may be, we find that Mr. Harding says in his testimony that after his return from the East in July, 1875, he entered upon an investigation of the affairs of the company, and endeavored to devise ways and means by which the company might continue its business. He says he then thought the stock was worth about 25 cents on a dollar, and it is shown that his investigation of the company's condition, however limited it may have been, was occasioned by the alarm excited in his mind by conversations with Walker while they were upon their eastern trip. Failure to succeed in any measure for the relief of the company in its extremity was followed by the contract with Clark and Walker of July 24th. This was the first step in proceedings then inaugurated for the protection of his interest, and was undoubtedly prompted by the apprehension, if not belief, that the loss of his entire investment was threatened. During the succeeding month of August he certainly knew that the company was in a crippled condition, and believed it to be insolvent, for this is established by his own testimony. By the contract of July 24th and the assignment concurrently executed, Mr. Harding, as we have seen, disposed of his stock, and acquired in return therefor all of Clark and Walker's interest in the preferred debt. This was followed by the meeting of the directors of July 29th, which provided for the return of the moneys and securities advanced under the resolutions of September 11 and 30, 1874. Then came the meeting of the executive and finance committee of August 12, 1875, when a subcommittee, consisting of Clark and Kimball, was appointed "to confer with Mr. Harding in regard to

disposing of preferred debt and his account." Mr. Harding was then a member of the finance committee, and was yet president of the company. As before stated, it is claimed by the complainants that a settlement in full was actually consummated between Mr. Harding and Clark, after the special committee was appointed, and before the 30th of August; that by this settlement Harding was to receive from the company certain of the securities here in question at fixed values, amounting to $135,000, in payment of his entire claim; and that nothing thereafter remained to be done but to secure the ratification of the company. All this is denied by Mr. Harding. It must be admitted that the resolution passed by the directors at their meeting of August 30th, whereby they resolved that the settlement made by the executive committee with Mr. Harding be approved with certain corrections, tends to corroborate with not a little force the claim of complainants that a settlement had been previously agreed upon. But, regarding it as a doubtful question, it is clear that the settlement which was ultimately consummated between Mr. Harding and the company was set on foot when the executive and finance committee took action on the subject; that negotiations in detail were carried forward by Mr. Harding and Clark, and that these negotiations contemplated not only security to Mr. Harding on account of his cash advances, but also for his interest in the so-called preferred debt; and after much consideration of the case in all its aspects it has become my conviction that the various steps thereafter taken, including the giving of the demand note with the accompanying securities, the sale of the securities to Hough, the ratification of that sale by the company, the repurchase of the securites by Harding, the sale back to the company by him of the Clark mortgages, and the execution to him of the company's notes therefor, the record proceedings of the board of directors in relation to these transactions, and the ultimate purchase of the Clark mortgages by Mr. Harding under the power of sale which was annexed to the notes, constituted a series of acts whereby, so far as was possible, Mr. Harding should obtain security on account of his entire claim against the company, which consisted of his interest in the preferred debt and his cash advances, and by means of which he should become vested with the title to the entire mass of securities which it is sought by the present bill to reach for the benefit of the general creditors. It is to be observed that in the negotiations which preceded the execution of the demand note it had been proposed that Mr. Harding should take from the company a large part of the same securities which he ultimately received as collateral to the demand note. Mr. Harding testifies that during those negotiations he thought it questionable whether he could take those securities from the company, and hold them in the manner proposed, and I think the evidence as a whole sustains the conclusion that the immediate object of the demand note was to give the transaction such outward form and character as would enable Mr. Harding, in the most effectual manner possible under the circumstances, to hold the securities which were delivered to him as collateral to the note. Mr. Harding drew the resolution of August

30th in regard to the demand note. He asked that the record should show such a resolution, and the directors asked him to prepare it. The face amount of the securities was greatly in excess of the note. In order to get the demand note, Mr. Harding testifies that he promised, in case the company did not pay it, and he should sell the collaterals, he would make with the company such a contract as was subsequently expressed in his letter of October 4, 1875, to U. P. Smith, then president of the company, which was in part a contract to sell the Clark mortgages back to the company, and give it a receipt in full for his advances under the resolutions of September, 1874. In form the demand note was given for Mr. Harding's cash advances outside the resolutions, but I cannot doubt that it was intended that the securities transferred as collateral should be sufficient, at least, in amount to cover and secure his interest in the preferred debt. The transactions which follow the giving of the demand note tend to strengthen this view.

## The Hough Sale.

Ostensibly the transaction between Mr. Harding and Hough was a sale of the securities and a transfer of the title to Hough, but the evidence shows that it was in fact only a sale in form. The amount of the securities was large,—Hough says between $150,000 and $200,000. Hough had no money with which to buy them, and states that he so told Harding. Still Harding appears to have been urgent that he should take them, and finally Hough gave his unsecured note for $60,000, and took possession of the securities. The parties were occupying offices in the same suite of rooms. The alleged sale, ostensibly under the power contained in the demand note, was private, and it is very clear that the transaction was not intended to be a permanent transfer. It is true Hough testifies that there was at the time some conversation to the effect that the parties were not to have any understanding that would invalidate the sale, and to the further effect that Harding wanted to sell, and that Hough was to hold the securities. But he also testifies very decisively that he understood that, if Mr. Harding wished to buy the securities back, he could do so, and that Harding stated at the time that he might want to purchase them back, and that Hough replied that he could have them back if he wanted them. Further, Hough testifies directly that he does not think he should have made the purchase and given his note if he had expected to keep the securities and meet his note, but that he was abundantly secured in giving the note. Then what followed? Hough held the securities for two or three, months, then delivered them back to Harding, his $60,000 note was destroyed, and $250 was allowed him as a sort of payment in the transaction on a claim that Harding held against him. The real meaning of all this is not doubtful. It was form, not substance. To a court of equity, whose duty it is to look into the real meaning of transactions when they become the subject of investigation, it is clear that this was but a device by means of which it was sought to strengthen Mr. Harding's title to the securities, and it cannot, in my judgment, be held to have improved his title. His position

with reference to legal rights and liability was not changed by anything which transpired between himself and Hough.

### Sale of Clark Mortgages.

It is evident from Mr. Harding's letter to U. P. Smith of October 4, 1875, that he did not then regard his title to the securities as perfect, and he therein formally proposes, according to what was undoubtedly the previous understanding, to sell the Clark mortgages to the company for the amount of the demand note, and take new notes from the company, to be due in two, four, six, and eight months from September 30, 1875, as a condition of confirming the title of his vendee to the collaterals. And upon such contract being carried out he proposed to give to the company a receipt in full for his advances under the agreement of September, 1874, containing the condition that the title of his vendee to the collaterals should stand good and unimpeachable. This arrangement was, in effect, carried out. The Clark mortgages were sold back to the company, and it gave to Mr. Harding therefor its notes, aggregating in amount $50,274.53, with the Clark mortgages as security for their payment when due, and he released the company from all liability under the agreement of September, 1874. It is quite incredible that the parties supposed, in the then condition of the company, that those notes could be paid at maturity. They were not paid, and the collateral mortgages were sold to Mr. Harding under the power of sale annexed to the notes. By this form of transaction Mr. Harding acquired the ultimate title to the Clark mortgages, and by his alleged repurchase from Hough he acquired his ultimate title to the other securities in question, and to that extent his claims against the company were satisfied, and the company was discharged from its agreement of September, 1874, to return to him the advances which he had made under the resolutions of that date. Unless, therefore, other grounds of defense than such as have been heretofore indicated are established, I am of the opinion that to the extent of Mr. Harding's interest in the so-called preferred account, he cannot hold the securities in question against the claims of general creditors of the company.

### As to Fraud and Misrepresentation of Clark and Walker.

But it is insisted by Mr. Harding that he was induced by misrepresentations and fraud to become a stockholder in this company, and to make advances of money under the resolutions of September, 1874; that on discovery of the alleged fraud he had a right to rescind all contracts under which he acquired stock and made advances; and that his agreement with Clark and Walker, of date July 24, 1875, in connection with the resolutions of the board of July 29, 1875, was a valid rescission, by virtue of which he became entitled to the return or to a resale to him of his original securities or other securities sufficient to make him good. Limiting the consideration of this point to the purchases of stock and to the advances covered by the resolutions of September, 1874, and saying nothing about the advances made outside those resolutions, there are,

in my opinion, several conclusive reasons why the supposed right of rescission could not be exercised against the policy holders and creditors of the company. And first, as before observed, the contract of July 28, 1874, under which the defendant Harding made his original purchases of stock, was made with Clark and Walker individually. It is true that they were officers of the company at that time, but they nevertheless contracted, and Harding dealt with them, in their individual capacities, and not otherwise. This is apparent on the face of the contract, and for any fraud practiced by them in that transaction they, and not the company, were responsible. The company did not sell the stock. Clark and Walker sold it; and, even if the defendant had brought himself within the rule that requires promptness in rescinding a contract on the ground of fraud, I could not assent to the proposition that he could rescind this contract, and reclaim the money he paid for stock thus acquired to the prejudice of policy holders and creditors of the company. Moreover, I am constrained to hold that Mr. Harding did not act with the promptness that would enable him to rescind or cancel his purchases of stock, and this observation is equally applicable to the advances of money made under the resolutions of September, 1874. I am not forgetful of the fact that Mr. Harding insists that he did not discover the alleged fraud until August, 1875, and that, therefore, the attempted rescission was seasonably made. But he was president of the company from August 25, 1874, until August 30, 1875. He participated in its affairs as its principal officer and as a member of the finance committee, and, notwithstanding the claim that he was all of the time ignorant of the condition of the company and of the manner in which its business was being conducted and of the value of its securities, I cannot, in view of his relations to the company, regard his claim in this behalf as tenable. He certainly had opportunity to learn all those facts of which he now alleges he was ignorant, and as president of the corporation he had particular facilities for acquiring the necessary knowledge; and if he did not avail himself of those opportunities and facilities the law must impute to him that negligence which estops him now to assert a right to rescind the contracts in question on the ground of fraud not discovered until the attempted rescission was made in 1875. He knew when he went into the company that its capital had been impaired. He knew that one of the objects of the reorganization of the company after he and his associates became stockholders was to remedy that impairment. It is true that Mr. Harding alleges that one of the alleged fraudulent representations made to him was that only $60,000 was required to put the company upon a sound basis, but it appears that concurrently with advancements of money made by Clark and Walker and Harding, McCoy & Pratt, amounting to over $144,000, the board of directors, of which Mr. Harding was then president, by resolution declared that $150,000 was needed to relieve the company from previous impairment of capital, and all the parties appear to have proceeded upon that understanding; and thereafter, and with that knowledge, Mr. Harding continued his connection with the company, and it cannot be successfully denied

that he was an active participant in the efforts subsequently made, and which he must have known it was necessary to make, to maintain the company as a solvent corporation entitled to public confidence. Moreover, I do not find from the testimony, that at the time of his transactions with the company in August, 1875, he then asserted to the company his right to rescind contracts previously made on the ground of fraud. Indeed, it appears to have been Mr. Harding's view, when negotiations were in progress looking to a direct surrender of securities in payment of his share of the preferred debt, that the company's right to make such surrender and his right to receive the securities were questionable. Upon the general question under consideration, the cases of Ogilvie v. Insurance Co., 22 How. 380, 16 L. Ed. 349, and Upton v. Tribilcock, 91 U. S. 53, 23 L. Ed. 203, are instructive, and not without force. I have examined the cases cited on the argument in support of the claim made by the defendant on this branch of the case. In Bank v. Addie, L. R. 1 H. L. Sc. 145, it was held that, where a person has been drawn into a contract to purchase shares by the fraudulent misrepresentations of directors, and where the directors, in the name of the company, seek to enforce such a contract, or where the person who has been deceived institutes a suit to rescind it, the misrepresentations are imputable to the company, and the purchaser cannot be held to his contract. In this case the bank owned the shares of stock that were sold. The purchase was made on the faith of reports made by the manager of the bank, who caused the shares thus owned by the bank to be sold upon fraudulent representations made by an authorized subagent. The bank sought to enforce the contract to purchase the shares. The case in its essential facts is plainly distinguishable from the case at bar. In the case of Mining Co. v. Smith, L. R. 4 H. L. 64, the directors in their official capacity issued a prospectus concerning an American mine, which contained false and fraudulent representations, and the respondent purchased from the company shares on the faith of the prospectus; and upon such a state of facts it was held that he should be relieved from liability upon his purchase. Wright's Case and In re London & Mediterranean Bank, 7 Ch. App. 55, were of the same nature. These cases are so dissimilar in their facts to the case at bar that they cannot be held controlling upon the question as it is here presented. If I correctly understood the learned counsel for the defendant, he contended that the case of Upton v. Tribilcock, supra, sustained the view here argued that the alleged fraud of Clark and Walker in selling the stock to Harding gave to the latter the right to rescind his contracts of purchase, without regard to the rights of the general creditors of the company. I am unable to concur with counsel in that conclusion. There was a strong dissent in that case, and the views of the dissenting justices, so far as they were expressed, lend some support to the contention of the defendant here upon this point. But the principal opinion, which is, of course, to be accepted as the law of the case, as I understand it, supports the views I have expressed upon this question.

## As to Pledge of Securities to Harding Under Resolutions of September, 1874.

Concerning the claim that the agreement created by the resolutions of September, 1874, constituted a pledge of securities in favor of all who advanced those securities on the faith of that agreement, it may be said that this claim was undoubtedly well founded as between the company and the parties who made the advances; but it was not a pledge that could be enforced to the prejudice of policy holders and creditors, especially in view of the fact that by virtue of the resolutions the moneys and securities advanced became part of the assets of the company, subject to the payment of all indebtedness of the company to policy holders. Thereby the pledge in favor of creditors became paramount to that in favor of the parties who made the advances. Having determined that to the extent of Mr. Harding's interest in the preferred account he cannot hold the securities in question or their proceeds against other creditors of the company, it becomes necessary to inquire—First, what was the amount of money advanced by him under the resolutions of 1874; and, secondly, what was his entire interest in the so-called preferred account on the 30th day of August, 1875?

### Amount Advanced by Harding Under Resolutions.

It is claimed by the complainants that Mr. Harding's individual share of the advances covered by the resolutions of September, 1874, was $51,718.75, which includes $25,000 known as the "Monmouth National Bank Call Loan." The defendant denies that this item of cash was put in under the resolutions, or that it ever was part of the so-called preferred debt, and it appears in his account against the company for subsequent advances made outside the resolutions, under date of February 4, 1875. That Mr. Harding owned two-fifths of the Union National Bank stock, $3,000, and two-fifths of the telegraph bonds, $1,800, put in under the resolutions, there is no question. Then it appears from the records that the sum of $46,918.75 was advanced in cash, and it cannot be claimed, and is not claimed, that McCoy and Pratt made any part of this cash advance. It all came from Mr. Harding. The three items of $3,000, $1,800, and $46,918.75 make the before-mentioned aggregate of $51,718.75, and, rightfully or wrongfully, the Monmouth Bank loan of $25,000 is part of the $46,918.75. Now, is Mr. Harding right in his claim, or is he now in position to claim that that item should not be treated as part of the $46,918.75, and as advanced under the resolutions? It is not clear when the $25,000 was paid to the company. The circumstances indicate that it was paid in at an earlier date than that under which it is charged in Mr. Harding's account. Indeed, it must have been paid a considerable time before November 3, 1874, because it is shown that he was paid interest thereon by the company to the amount of $430.50 on that day. The testimony tends to show that the original draft of the resolutions of September 30th was not filled up as to amounts when passed, and probably because all the advances then intended to be made had

113 F.—22

not yet been made. The $46,918.76 is named in the recorded res-olutions as advanced in cash. As before stated, there is no doubt it included the $25,000 in question. Now, as the resolutions in effect declare ;that that amount was advanced to remedy the im-pairment of capital, and was received under the resolutions, is it permissible for Mr. Harding, as against policy holders whom it was intended to protect by the resolutions, now to assert that in fact that money was not advanced for the purpose declared in the res-olutions? I think not. It seems to me that he is now estopped so to do. The resolutions were adopted at a meeting of the board at which he presided. The original draft was filled up as to amounts before it was placed upon the secretary's record. That record ap-pears to be complete, and is signed by the secretary. The testimony of both Walker and Clark tends to show that the $25,000 was paid in under the resolutions. It seems to have been so understood at the time by both of those parties. It is true that there is other tes-timony to the effect that Mr. Harding, at some time subsequent, in-sisted that the amounts as stated in the resolutions were incorrect, and that the Monmouth Bank loan ought not to have been in-cluded therein. But the resolutions were suffered to remain un-changed, and all the parties appear to have subsequently acted thereon. If the resolutions were wrong, they should have been corrected at the time, and should not have been permitted to remain as the basis of the company's future action. It is stated in the tes-timony on this subject offered in behalf of the defendant, that the resolutions of September 30th wherein they name amounts were subsequently corrected, but I am not able to find a record of any such correction. Of course, no improper increase of the amount advanced by Mr. Harding under the resolutions should be made or permitted; and if the records showed that such correction of the resolutions was made as would place the $25,000 in question outside the resolutions, I should not hesitate to allow defendant's claim upon this point. That the $25,000 was in fact at the time classed with the advances under the resolutions, and was so treated by Walker as well as Clark, there can be no doubt. Even Exhibit Z; which is the best evidence produced of the basis on which the final settlement was made, declares that the whole amount received un-der the resolutions of September 30, 1874, as per record, was $144,-918.74; and the acceptance of this amount as correct necessa-rily includes the Monmouth Bank loan. The testimony quite strong-ly shows that Mr. Harding permitted other parties to arrange the so-called preferred debt account, and without perhaps fully under-standing at the time of what items the aggregate was composed; and I am constrained to think that he must be held bound by what was done at the time by the record as it has ever since been per-mitted to stand. The resolutions of October 11, 1874, provided that no interest should be paid as stipulated in the second resolution of the series adopted September 11th, except out of the surplus earnings of the company, and it is claimed that on November 3, 1874, interest to the amount of $430.50 was paid to Mr. Harding by the company on the Monmouth Bank loan; and this is urged as

a circumstance tending to show that the amount of that loan was not advanced under the resolutions. But this item of interest appears to be charged to Mr. Harding on the debit side of his account with the company, appearing on the "memorandum pass book" in evidence, and giving to the circumstance that this payment of interest was made as claimed, its proper weight. I do not deem it sufficiently potent to overcome the facts that the item in question was otherwise dealt with as advanced under the resolutions, that it was included in the amount declared by the records of the board to have been so advanced, that it was thereby made part of the basis upon which the company proceeded in its business, and that the record as thus originally established was never changed.

### Harding's Interest in the Preferred Account.

The next question is, what was Mr. Harding's entire interest in the so-called preferred account on the 30th day of August, 1875? And I have no hesitation in holding that the principal of his claim under the account was $101,718.75. His individual advances under the resolutions, as has just been determined, amounted to $51,718.75. Then under the contract with Clark and Walker of July 24, 1875, he transferred to them his $75,000 of stock, and took from them an assignment of the moneys and securities which Harding, Mc-Coy & Pratt had paid to Clark and Walker on account of their original purchase of stock, amounting to $75,000, and which were treated in the contract of July 24th and in the last-mentioned assignment as advanced to the company under resolutions of September, 1874. But in fact, as shown by the resolutions, Clark and Walker put in but $65,000, and this was their actual interest in the preferred debt, and must be regarded as the interest in fact transferred to Harding by Clark and Walker in exchange for the former's stock. Adding, then, the $65,000 to the $51,718.75, and we have an aggregate of $116,718.75. But this did not ultimately represent Harding's interest in the preferred debt on August 30, 1875, because, as appears by the contract with McCoy and Pratt of August 9, 1875, made after the contract of Harding with Clark and Walker, McCoy and Pratt claimed the right to exchange $15,000 of common stock of the company for $15,000 of the securities put in under the resolutions by Clark and Walker, which right was, by the settlement then made, in effect allowed; and when this $15,000 is deducted from $116,718.-75 there is left $101,718.75 as the defendant Harding's interest in the preferred account. The same result was reached in a somewhat different form in the contract of settlement with McCoy and Pratt, by which, in satisfaction of their share of the securities put in under the resolutions, and of their right to exchange common stock for securities advanced by Clark and Walker, $43,200 were allowed them in securities and cash; which amount, deducted from $144,918.76, the whole amount put in under the resolutions of 1874, leaves $101,718.76; and this, it will be noticed, is stated in Exhibit Z, in evidence, as the principal of Mr. Harding's claim under the preferred account, added to which, as appears in that exhibit, is the interest thereon, $15,121.79, making a total of $116,840.55; and to

this extent and amount I hold that the securities in question or their proceeds may be reached by complainants for the benefit of creditors, subject, however, to a further ascertainment of facts as to the amount and character of creditors' claims entitled to share in said securities or their proceeds.

### Amount of Harding's Cash Advances Outside the Resolutions.

That Mr. Harding made large advances of money to the company outside of the resolutions of 1874 must be admitted, but the amount of those advances is a much-controverted question. According to his account, appended to the amended answer, the amount of the principal of those advances prior to August 30, 1875, was over $175,701.83. He allows in the account certain credits amounting to $72,018.75, which would leave a balance of $103,688.08. This, however, leaves in the account, and as part of such advances, the Monmouth Bank loan, amounting to $25,000, which, as I have held, must be regarded as representing part of his interest in the preferred debt, and therefore should not be included in the advances outside the resolutions. Then the account contains also an item of $24,500 cash value of railroad bonds, of which it is shown that $21,918.76 was originally advanced under the resolutions of 1874, for it is part of the item of $46,918.76 named in the resolutions of September 30th as advanced by Harding, McCoy & Pratt. The $25,000 and the $21,918.76, making in the aggregate $46,918.76, should, therefore, not be included in the advances outside the resolutions, and should be deducted from the before-mentioned amount of $103,683.08; and, when so deducted, the balance is $56,764.32. There is serious controversy over the items in Mr. Harding's account which are part of the last-mentioned sum, it being claimed by the complainants that some of the largest of those items consist of moneys used by Mr. Harding in the purchase of additional stock of the company. It appears that no accurate account was kept of Mr. Harding's advances as the advances were made. The account which he now presents I understand to have been prepared after this bill was filed, and from the best data at his command, but not from the memoranda made when the moneys were advanced. Certain checks drawn by Mr. Harding in favor of the company are produced, which, of course, are evidence that he made advances, but the exact amount of the advances is still left in doubt, unless his present account is accepted without qualification. It is evident that at the time of the action of the board of directors on the 30th of August, 1875, with reference to a settlement with Mr. Harding, none of the parties were able to state the exact amount of his cash advances. Some incomplete memoranda were furnished, showing a cash balance in favor of Harding of from $9,000 to $12,000, and there is testimony in the case to the effect that it became necessary to make various additions to the amount at first supposed to represent the cash balance; but all the testimony of this character is manifestly unsatisfactory. After much examination of the evidence, I have come to the conclusion that Exhibit Z should be accepted as furnishing the basis for a conclusion upon

this question. It is a statement of account made at the time of the final adjustment in August, 1875. It was prepared by the secretary, Mr. Walker, and I can have little doubt was made the basis of final action by all the parties in interest. It shows that Mr. Harding's balance of cash account against the company was then regarded as $38,376. It is suggested on the part of the defendant that this statement of account contains only items of advances to June 24, 1875, and that, as appears by the account now submitted by Mr. Harding, he made advances down to and including August 30, 1875, and it is argued, therefore, that Exhibit Z cannot be correct. But there are evidently errors of date in Mr. Harding's present account, and it is to be noticed that, although some of the items in that account are dated August 30, 1875, the same items are in Exhibit Z, the credit side of which, so far as it covers Harding's advances, closes June 24, 1875. This shows that in preparing Exhibit Z the intention and effort were to bring the account down to the time of the final settlement. Then, as before stated, the amount of Mr. Harding's cash balance on account of advances is declared in Exhibit Z to have been at that time $38,376. This does not equal the amount of the demand note, which was $47,743.52, the difference being $9,367.52. But the evidence shows that computations and recomputations of interest were made, and that the premium on bonds was added, so that it is not unreasonable to conclude that the parties at that time, for the purpose of the ultimate settlement, adopted the amount of the demand note as the amount to which the defendant Harding was entitled on account of cash advances and interest. And it is my conclusion that, in view of what then transpired, those advances should be held not to have exceeded, on the 30th of August, 1875, $47,743.52. It is urged by the defendant that these advances should include $10,000, part of the original $25,000 paid by Harding, McCoy & Pratt for their stock; but I think this claim is not well founded. Whether that $10,000 went into the so-called preferred account or not, it was money paid by Harding, or Harding, McCoy & Pratt, for stock on their original purchase, and I do not think it can be legitimately given a place as part of the cash advances.

### Rights of Parties with Reference to Harding's Cash Advances.

Can the defendant Harding hold the securities in question under the settlement of August 30, 1875, in payment of his cash advances, or as security therefor? This question was urged by complainants' counsel with the evident understanding that, if this branch of the case should be decided adversely to the defendant, the rights of the parties, so far as the defendant's cash advances were concerned, would be finally determined. I am constrained to say, however, that, even if the question before stated be answered in the negative, there may still remain not only the inquiry whether Mr. Harding in that case would not be entitled to share pro rata with other creditors in the securities, or their proceeds, to the extent of his cash advances, but the further question whether, on marshaling all claims against the company, he would not be entitled to be

paid his advances in full from the assets of the company, in prefer-ence to policy holders, without regard to any previous attempted settlement. Without, at this stage, pursuing these suggestions, I proceed to consider the question first stated. That Mr. Harding and his co-directors to the time when he ceased to be an officer and director of this insurance company, in a strong sense, held the position of trustee of the assets of the company for the benefit of its creditors, cannot be successfully disputed. 2 Story, Eq. Jur. 1252; Bliss v. Matteson, 45 N. Y. 22; Bartlett v. Drew, 57 N. Y. 587. "The directors of a corporation stand in confidential relations to its creditors, towards whom they are bound to act with perfect fairness. They are at least quasi trustees for the creditors, and where the corporation is insolvent good faith forbids that the direct-ors should use their position to save themselves or one of their number at the expense of the other creditors." Coons v. Tome (C. C.) 9 Fed. 534. "The directors of an insolvent corporation, while it is under their management, hold the position of trustees of its assets for the benefit of its creditors, and, if themselves cred-itors, cannot secure to themselves any preference or advantage over the other creditors." Bradley v. Farwell, 1 Holmes, 433, Fed. Cas. No. 1,779. "The managers and officers of a company where capital is contributed in shares are, in a very legitimate sense, trustees alike for its stockholders and its creditors, though they may not be trustees technically and in form." Jackson v. Ludeling, 21 Wall. 616, 22 L. Ed. 492. See, also, Drury v. Cross, 7 Wall. 299, 19 L. Ed. 40, and Koehler v. Iron Co., 2 Black, 720, 17 L. Ed. 339, for recognition of the same general principle. Undoubtedly an insol-vent debtor, whether a corporation or individual, may at common law prefer one of its creditors. Bradley v. Farwell, supra; Drury v. Cross, supra. But this is a principle only applicable to trans-actions which in no manner involve advantages secured in whole or in part by virtue of a fiduciary relation. To further point out the relations which Mr. Harding bore to this company when the settlement between them was negotiated, and the circumstances of the transaction, would be to repeat much that has been stated. There is no doubt whatever that the advances of money repre-sented by the demand note in evidence were made by Mr. Harding in good faith, and at times when the exigencies of the company demanded that its resources be strengthened. There is no doubt that on the 30th day of August, 1875, there was an actual and valid indebtedness owing by the company to Mr. Harding on ac-count of these advances. Nevertheless the law forbade Mr. Hard-ing and his co-directors, at a time when they knew the company was in extremis, and when his relations to the company were such as to enable him to exercise his power as a member of the corpo-ration for his own protection, to appropriate the assets of the com-pany to the payment of his individual demands, in the manner in which such appropriation was attempted here, however honest and just those demands were. In such circumstances the only safe and true position he could take was that of a creditor, who, in the ulti-mate distribution of the assets of the corporation, might insist upon

a preference so far as his advances were concerned, and, if need be, make his lawful appeal to the courts for the establishment of such rights as equity might permit him to assert. As has been heretofore observed, while yet Mr. Harding held the position of an officer and director of this company, and at a time when he knew the company was insolvent, measures were set on foot for his individual protection and security. His associates in the management co-operated with him in the accomplishment of this object. The initiatory steps were taken a considerable period before he retired from the presidency of the company. That he took toward the company the position of an adversary, I think can make no difference. As between himself and the company, he may have asserted hostile demands against the company, but as to general creditors the law must treat the combined action of the directors of the corporation in the transaction as collusive. It is true that the resolutions in relation to the demand note were not passed, and the note was not executed, and the securities were not delivered, until after Mr. Harding had resigned as president. But all this transpired at one and the same meeting. It is evident that the resignation was tendered in view of the culminating act, which had been preceded by a series of steps which led up to it, and which had all taken place while Mr. Harding held a trust position in the company. Even admitting that a settlement had not been fully consummated before Mr. Harding's resignation, yet the negotiations had been substantially concluded before that event, and there was little left to do on the 30th of August but to provide for details and complete the transaction by execution of the note and delivery of the securities. I do not think the resignation, in view of all the circumstances, can be regarded as effectual to so far relieve Mr. Harding of his relation of trust to the assets of the corporation as to enable him thus to secure a personal advantage. As we have seen from references to the records already made, the executive and finance committee of the company on the 12th day of August, 1875, took formal action on the subject of a settlement with Mr. Harding by appointing a special committee to confer with him "in regard to disposing of preferred debt and his account," and Mr. Harding participated in the proceedings of this meeting; and at the meeting of the board on August 30th, when Mr. Harding resigned as president, it was resolved that the settlement made with him be approved, with certain corrections, thereby implying that the terms of a settlement had been previously agreed upon, and only needed formal ratification. The evidence shows, as before stated, that Mr. Harding, desiring that the records would show a resolution authorizing the demand note, at the suggestion of the directors drew the resolution, and the demand note was executed and the securities were delivered on that day. It may be true that in a certain sense Mr. Harding was occupying a position antagonistic to the company, but it seems very plain that the transaction consummated on the 30th of August was brought about by the active co-operation of the directors of the company, and I am unable to avoid the conclusion that the influence and power of Mr.

Harding before he terminated his connection with the company were potent in the accomplishment of the desired object. Cases in England and this country in which the principle of law here applicable was enforced are numerous, yet, of course, as cases differ in their particular facts and circumstances, no one of them that I have examined is exactly like the present. In Koehler v. Iron Co., 2 Black, 715, 17 L. Ed. 339; in Drury v. Cross, 7 Wall. 299, 19 L. Ed. 40; and in Jackson v. Ludeling, 21 Wall. 616, 22 L. Ed. 492,— the general principle is recognized and enforced that the managers of a corporation have no right to enter into or participate in a combination or agreement to promote their own advantage at the . expense of the company, its stockholders, or its creditors. See, also, Ex parte James, 8 Ves. 337; Ex parte Lacy, 6 Ves. 625; Fox v. Mackreth, 1 White & T. Lead. Cas. Eq. pt. 1, *151; 12 Wkly. Rep. (V. C. W.) 510. Bradley v. Farwell, 1 Holmes, 433, Fed. Cas. No. 1,779, decided by Judge Shepley, is an instructive and well-considered case. In the opinion of the court it is, among other things, said:

"Courts of equity were established for the purpose, among others, of enforcing the execution of such matters of trust and confidence as are binding in conscience, though not cognizable in a court of law. Such courts will not permit trustees, in the exercise of the powers of their trust, or in dealing with the trust estate, to obtain any benefit or advantage for themselves to the injury or prejudice of those for whom they are acting in the fiduciary relation, or to protect, indemnify, or pay themselves at the expense of those who are similarly situated in relation to the fund. * * * The fiduciary relation between the directors and the creditors being established, and the fact that the trustees in dealing with the trust fund have secured to themselves a benefit or advantage to themselves as creditors over and above the other creditors, taints the transaction, and invokes the aid of a court of equity to see to the right execution of the trust. Not that the trustees cannot prefer one creditor to the others at common law, * * * but that, in equity, a trustee cannot contract with himself as he may with third parties. If he exercises in his own favor the powers he may rightfully exercise in favor of another, the court does not stop to inquire whether he gained or lost. It is enough that the beneficiary is dissatisfied with the transaction for the court to set the transaction aside, without requiring the beneficiary to prove actual loss or actual fraud. * * * Especially in the case of insolvent corporations are the acts of the managing officers to be free from the imputation of having been influenced by the consideration of any interests adverse to those they are bound only to regard. Standing in a fiduciary relation, as it were, at the bedside of a dying patient, if they are subsequently found in possession of a portion of his effects, they must show title by a conveyance untainted by the exercise of that power which the trust relation gave them to influence the disposition made by the decedent of his property in their favor and to the prejudice of others having equal claims to the inheritance."

Without further prolonging the discussion upon the question under consideration, I am of the opinion that Mr. Harding cannot, by virtue of the settlement consummated on the 30th of August, 1875, hold the securities in question, or the proceeds thereof, in payment of his advances represented by the demand note. It will remain, however, an open question, to be determined on marshaling and distribution of the assets of the company, what may be the rights of Mr. Harding, so far as his cash advances are concerned, as between himself and general creditors, the attempted settlement

with the company being now held unsustainable in equity; and that question, which I regard an important one, will be reserved for future consideration at the proper time.

### As to Alleged Pledge of Securities to Harding for Cash Advances.

It was part of the contention in behalf of the defendant Harding that he held the securities in question in pledge to secure him for his advances of money to the company. In the light of the testimony, and considering the relations of Mr. Harding to the company, it is very doubtful whether such a pledge of the securities was made as would enable him to hold them against the claims of other creditors, or as would strengthen his title under the settlement that was finally made. I am certainly not prepared to hold that the settlement can be upheld by virtue of what is claimed to have been such previous pledge. In what manner the rights and position of Mr. Harding as a creditor asserting a preference to the extent of his cash advances may be strengthened or affected by the supposed pledge of securities is a question that may arise hereafter, and which I do not now decide.

### The Claim of $27,000.

The further claim made against the defendant Harding of $27,500 I shall disallow. To entitle the complainants to a decree for that sum as a demand against him, the proof should be as clear as in an action at law for money had and received. The testimony on the subject is confused and unsatisfactory. Of course, if Mr. Harding originally got the money on the paper of the insurance company for his personal accommodation, and if the company ultimately paid the debt, and Mr. Harding was never charged with it, then he should account for the amount he thus personally realized. It seems to be conceded that the insurance company took up the paper at the bank, and that this was done after the settlement on the 30th August, 1875. But I am not satisfied that this item was not taken into consideration in the settlement. It is charged against Mr. Harding in the so-called "little red book." All that Clark appears to positively know of the transaction is that the $27,500 was paid to the bank after the settlement. Other than that he seems to know nothing with certainty about the item, although he thinks it was omitted in the estimate or account made at the time of settlement, and of the account he knew nothing except what was told him. The entry of the $27,500 was made in the little red book under date of December, 1874, and of the same date is a charge against Mr. Harding in Exhibit Z of $12,923.75, which, the proofs rather indicate, was such part of the $27,500 as was regarded at the time of the settlement chargeable to Mr. Harding. Mr. Harding testifies that this matter entered into the settlement of August 30, 1875; that the only charge against him growing out of the Union National Bank loan was $12,923.75; and that it was so understood at the time, and was charged to him accordingly. I am not free from doubt as to all the facts of the transaction, but, after considering such testimony as we have on the subject, my mind

inclines to the conclusion that the item in question entered into the settlement of August 30, 1875.

### Extent of the Defendant's Liability.

Counsel for the complainants take the ground in their brief that Mr. Harding, to the extent that he is liable to the creditors of the insurance company, should be charged with the amount of the so-called "Westcott securities" at their face, and without regard to their actual value. This is on the theory that he absolutely agreed to take those securities at their face value. I am of a different opinion, and shall hold him chargeable to the extent that he is required to account with the actual value of the securities to be hereafter ascertained, or the proceeds of such of the securities as have been converted into money.

### Objections to Testimony.

Specific objections have been made to the testimony of J. C. Latimer and C. M. Smith on the ground that it is not competent under any issue in the case. I have not considered that testimony with reference to the claim that there was fraud and collusion in the prosecution of the Bradner, Smith & Co. case, but only as showing the termination of Bradner, Smith & Co.'s interest in the suit, and for the purpose of showing that fact. I think it is competent. The objections to the testimony of Webster, Kimball, Wilmarth, and Jenkins are overruled.

### Proof of Losses.

The proofs that have been presented as to the indebtedness of the company and as to the extent of losses sustained by policy holders, the validity of their claims, and the different classes of creditors entitled to share in the assets of the company are not such as to enable the court to make a final disposition of those questions, and the case will have to be sent to a master for ascertainment of further facts before final decree.

### Character and Form of Decree.

An interlocutory decree will now be entered adjudging the settlement between Mr. Harding and the company under which the securities in question were delivered to him invalid to the extent of the valid claims of other bona fide creditors of the company, and inefficacious to vest the title thereto in him as against such creditors, and requiring him to account for the value of such securities; this decree to cover such settlement not only so far as it embraced his interest in the preferred debt, amounting to $116,840.55, but also to the extent of his cash advances, amounting to $47,743.52; and the case will be referred to Henry W. Bishop, as master, to ascertain and report:

First. What was the actual value of the securities in question on the 30th day of August, 1875, stating separately the value of each specific security on that day; and also what sum or sums of money, if any, as the proceeds of said securities, or any of them, Mr. Hard-

ing may have realized therefrom, with the dates when such sums were so realized. The master will also report any enhancement or depreciation in value of any of the securities not converted into money that may have occurred subsequent to August 30, 1875.

Second. The master will also ascertain and report the amount, character, and validity of the existing and unpaid claims of policy holders and other creditors of the company, including losses occurring prior to August 30th, and September 30, 1875, and now unsettled, also losses under policies issued prior to August 30, 1875, and occurring after that date, and losses under policies issued prior to September 30, 1875, and occurring since that date.

Third. To ascertain and report what assets the Globe Insurance Company had, if any, at the time it ceased to do business, other than the securities in question, and what disposition has been made of the same.

Fourth. To ascertain and report what amount or amounts of money Mr. Harding advanced to the company, if any, at the time of the alleged settlement. As it is claimed that further advances were at that time made by him, it is deemed proper that the proposed reference should cover that question.

The master will be at liberty, in prosecuting said reference, to make use of all competent testimony heretofore taken and now in the case, and to take such further and additional testimony as the parties may desire and as he may deem essential to a full development of the facts for the ascertainment of which this reference is intended.

The question of Mr. Harding's ultimate rights, if any, to a preferential payment from the assets of the company of the amount of his cash advances as a creditor of the company, irrespective of the settlement now decreed to be invalid, and also the question to what extent, if at all, the rights and position of Mr. Harding as a creditor asserting a preference to the extent of his cash advances may be affected by the manner in which the securities of the company were dealt with at the time the advances were made, are reserved for consideration on the coming in of the master's report, and the decree may so specifically state.